**BURGOON v. LAVEZZO et al.**

No. 6748.

United States Court of Appeals for the
District of Columbia.

Decided Aug. 23, 1937.

George C. Gertman, of Washington, D. C., for appellant.

Joseph T. Sherier, of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This appeal arises out of a suit instituted by the appellant Minnie M. Burgoon to restrain the appellees Sherier and Mc-Donald, trustees, and Rosa Lavezzo for whom they were trustees, from foreclosing by advertisement and public auction a trust deed upon land in the District of Columbia. The appellant claimed a prior right in the same land. The bill of complaint filed by the appellant set forth as a basis for the relief prayed, the following facts:

James A. Green and his wife were the record owners of a lot of land located at 1615 Eighth Street, N. W., in the District of Columbia. They encumbered it with a first deed of trust to secure a loan from the Perpetual Building Association, a second deed of trust to secure a loan of $1500 from Frances G. Dorsey, and a third deed of trust as security for a debt of $10,300 owed Rosa Lavezzo.[2] These conveyances were duly recorded, as were all other deeds and releases later mentioned. On July 30, 1931, the Greens, apparently unable to pay their debt to Dorsey, conveyed their equity of redemption in the property to Dorsey in fee simple and surrendered possession to Dorsey. Dorsey accepted this conveyance upon the belief and upon the representation of the Greens that the first and second trusts were the only encumbrances of record against the property and the only encumbrances to which the conveyance of the equity of redemption was subject. In view of the third trust in favor of Lavezzo, this representation was incorrect and the belief a mistake. On October 13, 1931, when there was owing on the first trust approximately $4145.21 and upon the second trust approximately $1437.18, Burgoon entered into a contract to purchase the land from Dorsey upon terms of cash or equivalent securities equal in value to the difference between $5600—the stated purchase price—and the amount of $4145.21 owing on the first trust, and to take title to the property subject only to this first trust, it being represented to Burgoon in behalf of Dorsey that the first trust would be the only indebtedness against the property when conveyed. Sometime after October 13, 1931, and prior to November 2, 1931, Burgoon paid the difference (alleged as $1554.79),[3] and on November 2, 1931, the property was conveyed by Dorsey to Burgoon in fee. As a part of this transaction between them, Dorsey applied the $1554.79 paid by Burgoon to the pay-

2 For convenience hereafter, last names will be used.

3 It will be noted that the difference between $5600 and $4145.21 is not $1554.79 but $1454.79. Nevertheless, throughout the record the sum of $1554.79 is named and treated as the amount of cash paid by Burgoon, and the trial court entered its decree upon the basis of that figure. We shall as a matter of convenience continue to refer to this balance of the purchase price in terms of $1554.79, but, as will be noted below, we direct an ultimate ascertainment of the correct figure.

ment, discharge and release of the second trust. This Dorsey did in order to perfect her title and to fulfill the contract to convey to Burgoon a good and unencumbered title subject only to the first trust. This application of the $1554.79 and this release of the second trust were made by Dorsey in ignorance of the existence of record of the third trust in favor of Lavezzo. The debt of the Greens for $10,300 in favor of Lavezzo remaining unpaid, Lavezzo demanded foreclosure of the trust deed securing the same, and the trustees advertised the property for sale at public auction to be held on September 12, 1935. Prior to the date set for the auction Burgoon instituted this suit to restrain the Lavezzo foreclosure and sale.

After certain intermediate proceedings in the trial court not here pertinent, Lavezzo, Sherier and McDonald, defendants below, stipulated, the stipulation to stand as their answer, that the allegations of fact set forth in the bill of complaint were true. The auction sale of the land in question was postponed and the case was submitted to the trial court upon the law applicable to the facts set forth in the bill of complaint. The trial court found as facts all of the facts alleged in the bill of complaint.

The contention of Burgoon under the bill of complaint was that she was entitled as against Lavezzo to be subrogated to the rights of Dorsey under the second trust, to the extent of $1554.79. Lavezzo on the contrary contended that the second trust having been released of record, the third trust rose to second place to the exclusion of any claim by either Dorsey or Burgoon. Under these contentions and upon the stipulated facts, the trial court concluded that Burgoon was not entitled to the subrogation claimed and a decree to this effect was entered.[4]

■■■ The stipulation filed by the defendants, admitting the facts set forth in the

bill of complaint but contesting the right of Burgoon to subrogation, is in legal effect a motion to dismiss upon the ground that, conceding the truth of the facts stated, they do not constitute a cause of action for relief in equity. Under familiar rules entitling a complainant under a motion to dismiss to the benefit not only of the facts stated in the bill of complaint but to legitimate inferences to be drawn therefrom, the admission of facts in the instant case necessarily includes an admission that at the time of the conveyance to Dorsey by the Greens of the equity of redemption and at all times thereafter until the date of the record release by Dorsey, it was the intention of Dorsey not to discharge and release the second trust, but on the contrary to retain and preserve for Dorsey's own protection the lien thereof. We say this because, as will have been noted above, the bill of complaint stated that the $1554.79 paid by Burgoon to Dorsey was applied by Dorsey to the payment, discharge and release of the second trust in order to perfect Dorsey's title and fulfill the contractual obligation to convey to Burgoon a good and unencumbered title subject only to the first trust. We think that a necessary inference from this fact is the one above set forth. The conveyance by a mortgagor to the mortgagee of the equity of redemption will not effect a merger if the parties intend otherwise. Factors' & T. Ins. Co. v. Murphy (1884) 111 U.S. 738, 743–744, 4 S.Ct. 679, 28 L.Ed. 582; The Bergen (C.C.A.9th, 1933) 64 F.(2d) 877; Guaranty Trust Co. v. Minneapolis & St. L. R. Co. (C.C.A.8th, 1929) 36 F.(2d) 747, 764–765, certiorari denied (1930) 281 U.S. 756, 50 S.Ct. 407, 74 L.Ed. 1166; 2 Pomeroy, Equity Jurisprudence (4th Ed.1918) § 793.

The sole question on this appeal is whether or not upon the admitted facts there was in Burgoon a right to be subrogated in the sum of $1554.79 to the lien of Dorsey under the second trust, or, putting it otherwise, did Burgoon under the facts

---

[4] Burgoon had set forth in the bill of complaint certain additional facts, not germane to the question raised in this appeal, as a result of which she claimed an additional right of subrogation in the sum of $1835.35 alleged to have been paid by her upon the first trust after she purchased the property from Dorsey, and a further right in the sum of $338.15 alleged to have been expended for repairs and improvements on the property. The

stipulation above referred to conceded Burgoon's right of subrogation for the item of $1835.35, and it was therefore allowed and is not involved in this appeal. The decree of the trial court denied Burgoon any right of subrogation for the item of $338.15 and the appeal as originally taken involved this item, but it is abandoned by the appellant in her brief upon appeal.

stated become an equitable assignee of the lien of the second trust. It is of course obvious that if the instant situation be regarded from the standpoint of strict law as distinguished from equity, the Lavezzo mortgage superseded the lien of the Dorsey trust. The case is one of first impression in this jurisdiction.

The doctrine of subrogation, as originally recognized in equity jurisprudence in England, was somewhat narrowly applied, chiefly in cases where a surety paid the debt of his principal. Some courts in this country have limited the doctrine rather strictly. In Citizens Mercantile Co. v. Easom (1924), 158 Ga. 604, 611, 123 S.E. 883, 886, 37 A.L.R. 378, the court, on this subject, said:

"This court has denied that subrogation is a benevolent doctrine, and that equity will apply it in any case in which justice required; and this court has refused to follow the cases which were based on this theory of the doctrine of subrogation. On the contrary it has held 'that subrogation will arise only in those cases where the party claiming it advanced the money to pay a debt which, in the event of a default by the debtor, he would be bound to pay, or where he had some interest to protect, or where he advanced the money under an agreement, . . made either with the debtor or creditor, that he would be subrogated to the rights and remedies of the creditor.'"

But there developed in some jurisdictions a more liberal application of the doctrine, said by some authorities to be applicable to almost all cases in which one person, not a volunteer, pays an obligation which in justice and good conscience ought to have been paid by another. This point of view is taken in Hudson v. Dismukes (1883) 77 Va. 242, 246–247:

"The doctrine of subrogation is not dependent upon contract, nor upon privity between the parties as between whom it is applied. It is the creature of equity, and is founded upon principles of natural justice. At first it was applied only in favor of those who were bound by the original security with the principal debtor; but it has been extended, and is now applied in favor of all persons who are required to pay the debt of another for the protection of their own interests."

The doctrine of subrogation is uniformly applied for the benefit of one who, taking title to property subject to a mortgage, thereafter pays off the encumbrance. He is said to be entitled to an equitable assignment of the rights of the mortgagee. See Aetna Life Ins. Co. v. Middleport (1888) 124 U.S. 534, 549, 8 S.Ct. 625, 31 L.Ed. 537; 2 Jones, Mortgages (8th Ed.1928) § 1119. On the other hand, it is ruled with equal regularity that one who purchases property and assumes and agrees to pay a mortgage thereon, and does so, is not entitled to be treated as an equitable assignee. He is said to be paying his own debt. See 2 Jones, Mortgages (8th Ed.1928) § 1098; 2 Pomeroy, Equity Jurisprudence (4th Ed.1918) § 797.

The instant case has some of the characteristics of each of the two cases just stated, but is not identical with either of them. Burgoon pursuant to a contract advanced money as a part of purchase price to pay off an existing encumbrance. Such a purchaser is like one who, buying property subject to a mortgage, pays the same, in that he acquires an interest in the property and is paying the debt of another for the purpose of protecting his own right. And he is like one who buys property and assumes the mortgage, in that he is paying as a result of contractual obligation.

It is therefore not surprising that the authorities which have ruled upon facts paralleling those in the instant case are divided, not to say confused, in respect of the purchaser's right of subrogation, that is, the right to be treated as an equitable assignee of the mortgagee from whom he takes title, and in respect of the theory upon which the right is recognized or denied recognition.

In some jurisdictions subrogation is denied in cases like that at bar upon the ground that constructive notice, and negligence in not noting the record, bars the purchaser who advances money. Typical is Stastny v. Pease (1904) 124 Iowa 587, 591, 592, 100 N.W. 482, 483, 484:

"They cannot plead that they had no notice of defendant's judgment, for it was of record when they purchased. They did not intend to, nor did they, purchase any of the incumbrances against the land. These they paid either as part of the purchase price or on behalf of Sargent [the seller-mortgagor], and if they are to suffer it is because of their own fault and neglect. The incumbrances were all extinguished, and if they are to be reinstated it will be

against the express intent of all parties. There is no room here for the doctrine of equitable assignment, and we do not think the rule authorizing subrogation applies. Plaintiffs' loss is due to their own negligence, and in such cases neither law nor equity will give them relief.

\* \* \*

"They are not . . . entitled to subrogation for the purpose of defeating the defendant's . . . lien. They had constructive notice of defendant's judgment, and undertook to make redemption and to pay the other liens. By reason of their negligence, they are not entitled to the relief asked. If this were not so, the doctrine of constructive notice would be of little avail. They do not succeed to the rights of the building and loan association, nor to those of the county and city, for in extinguishing their liens they did no more than they promised Sargent they would do."

Accord: Goodyear v. Goodyear (1887) 72 Iowa 329, 33 N.W. 142; Kuhn v. National Bank (1906) 74 Kan. 456, 87 P. 551, 118 Am.St.Rep. 332; Garwood v. Eldridge (1839) 2 N.J.Eq. 145, 34 Am.Dec. 195; Conner v. Welch (1881) 51 Wis. 431, 8 N.W. 260. See also Ragan v. Standard Scale Co. (1907) 128 Ga. 544, 58 S.E. 31; cf. Hayden v. Huff (1900) 60 Neb. 625, 83 N.W. 920, affirmed on rehearing sub nom. Peters v. Huff (1901) 63 Neb. 99, 88 N.W. 179. On the other hand a number of authorities which allow subrogation expressly consider the theory that constructive notice operates against the person advancing the money and reject it. Thus in Shaffer v. McCloskey (1894) 101 Cal. 576, 580–581, 36 P. 196, 197:

"The fact that the deed of trust was recorded is of no value. In many of the cases cited by respondent . . . the junior mortgage had been recorded. Respondent [the purchaser] clearly intended that his payment of the mortgage should inure to his own benefit, and not to the benefit of appellants [the junior mortgagees]; and there is no equitable ground upon which appellants can object to it so inuring."

And in Prestridge v. Lazar (1923) 132 Miss. 168, 177, 95 So. 837, 838:

"We are unable to see how constructive notice to appellant [the purchaser] of appellee's [the junior mortgagee] mortgage could have anything to do with the right of the former to subrogation. The controlling consideration is the actual facts. The question is: What is natural justice under the actual facts of the situation?"

Accord: Capitol Nat. Bank v. Holmes (1908) 43 Colo. 154, 95 P. 314, 16 L.R.A. (N.S.) 470, 127 Am.St.Rep. 108; Williams v. Libby (1919) 118 Me. 80, 105 A. 855; Wilson v. Kimball (1853) 27 N.H. 300; Joyce v. Dauntz (1896) 55 Ohio St. 538, 45 N.E. 900. We think constructive notice cannot conclude the problem. If it were the whole answer, subrogation should be denied where the purchaser takes subject to a mortgage—and yet it is, as above pointed out, in such case uniformly permitted. And of course subrogation is not allowed as against intervening equities acquired in reliance upon the recorded release of the lien in respect of which subrogation is sought. E. g., Hayden v. Huff, supra. It is to be noted that to allow subrogation does not restrict the effect of the record of the junior lien for the latter is merely replaced in its original position, i. e. junior to the lien in respect of which subrogation is allowed.

Another theory upon which subrogation is denied in cases like the instant case, is that the purchaser of property who advances money as a part of the purchase price to pay off a lien is paying his own debt and is, therefore, in the same category as one who buys property and assumes a mortgage. Exemplifying this point of view are the following: Goodyear v. Goodyear, supra; Stastny v. Pease, supra; Garwood v. Eldridge, supra; Kuhn v. National Bank, supra; De Roberts v. Stiles (1901) 24 Wash. 611, 64 P. 795; Klopfenstein v. Chadbourne (1932) 105 Pa.Super. 530, 161 A. 642; Citizens Mercantile Co. v. Easom, supra; Smith v. Feltner (1935) 259 Ky. 833, 83 S.W.(2d) 506. In the Kuhn case the court reasoned:

"Whether the land was worth more or less than the debts assumed, which constituted the only consideration for the purchase, is probably immaterial. At the time Kuhn [the purchaser] made the purchase he had no interest in the land to protect. At the time he paid the . . . mortgage he did not stand in the relation of surety for its payment; by his contract he had made it his debt. He became the principal debtor, and his grantor, who executed the note and mortgage, became the surety.

\* \* \*

"Whether [he] would have purchased the land had the judgment liens been brought to his attention, assuming he had no knowledge of them, is a question of pure speculation, as they were for small amounts. Being charged with the knowledge of these liens, and having no interest to protect, he must be held to have simply stepped into his grantor's shoes. When he paid off a mortgage that was prior to the judgment lien it had the same effect as if the payment had been made by the grantor before he parted with his title." [74 Kan. 456, at pages 459, 460–461, 87 P. 551, at pages 552, 553, 118 Am.St.Rep. 332]

And the court said, in McDowell v. Jones Lumber Co. (1906) 42 Tex.Civ.App. 260, 261, 93 S.W. 476, 477:

" . . . it is sufficient to say we are cited to no case and know of none, in which it has been held that a purchaser of the mortgaged property who assumes, as a part of the purchase money, to pay off the mortgage lien against the property, may do so and yet keep alive the mortgage as against a subsequent lien. The authorities appear to be all to the effect that a payment under such circumstances, being a payment of the purchaser's own debt, extinguishes the lien for all purposes and places such purchaser in precisely the same position as though the payment had been made by his vendor. [Authorities cited] If by the transaction appellant [the purchaser, who advanced money to pay a mortgage] did not assume to pay the bank debt to the extent of $3500 as the purchase money for the property, then he is in the attitude of having paid Thomas [the seller] the full purchase price, who in turn himself paid the debt and extinguished the lien. In no event, as we view the transaction, could appellant avail himself of the bank's lien to the prejudice of appellees' rights under the junior lien."

To the contrary a number of cases which allow subrogation expressly repudiate the position that the purchaser is in effect paying his own debt. Barnes v. Cady (C.C.A.6th, 1916) 232 F. 318; Joyce v. Dauntz, supra; Capitol Nat. Bank v. Holmes, supra; Johnson v. Tootle (1897) 14 Utah 482, 47 P. 1033; Williams v. Libby, supra. The view of these cases is expressed in Johnson v. Tootle:

" . . . we are of the opinion that the respondents are within the rule that whenever it is equitable that a security should be kept alive for the benefit of one advancing money to pay it off, and new rights have not attached in dependence of the apparent discharge of the prior security, subrogation will be allowed. In arriving at this conclusion, we have given due weight to the able argument . . . to the effect that one who assumes a debt becomes primarily responsible for it; that payment operates as a discharge, and that the securities cannot be kept alive for his benefit. But, under the facts in this case, we cannot subscribe to a proposition that would work such hardship and injustice as such a holding would impose upon innocent parties where no new rights have been created on the faith and strength of the altered condition of the legal rights." [14 Utah 482, at page 489, 47 P. 1033, at pages 1034–1035]

And in Joyce v. Dauntz, supra, it is said:

" . . . the purchase price was applied toward the payment of existing incumbrances. That application, though made with the assent of the vendor, did not constitute an assumption of the mortgage debt by the purchaser, nor render him liable to the mortgagee, nor exonerate the mortgagor. . . . True, at the time of the conveyance to Dauntz, the condition of the mortgages had become broken, and the estate he acquired was the equity of redemption; but that is sufficient to sustain his right to subrogation, if otherwise entitled to it. He is not in the situation of a stranger or mere volunteer discharging an incumbrance." [55 Ohio St. 538, at page 547, 45 N.E. 900, at page 902]

The theory that one who as part of purchase price supplies money to discharge a lien should be treated as if he had assumed and later discharged it, that it is immaterial whether the purchaser agrees with the seller to pay the encumbrance later (assumption of it) or to pay it now (payment out of purchase price), that in either case the purchaser has a primary obligation to the seller to pay the lien, and that when he does so he is only paying his own debt, has much formal vigor. But against it may be urged, looking at the problem more in terms of substance, that if the purchaser had had full knowledge of all the recorded liens, he could have made certain that he would be protected by taking a conveyance of the equity of redemption from the seller and an actual assignment from its owner of the lien

which he, the purchaser, was advancing funds ·to discharge. And thus it may be said that when the purchaser, merely through ignorance of the junior lien, omits this simple method of making sure that his payment will·inure to his own benefit as against junior liens, equity should, on account of his mistake, and in the absence of intervening equities, regard the substance rather than the form and treat the purchaser as an equitable assignee.

■ ■Still another group of cases regard the purchaser who advances money as a part of purchase price to pay off an existing lien as a volunteer. For this point of view see Kahn v. McConnell (1913) 37 Okl. 219, 220, 131 P. 682, 47 L.R.A.(N.S.) 1189:

"The fact that·he assumed the indebtedness . . . and paid it did not give him the. right of subrogation. In the matter of that payment he was a volunteer. He was under no duty to buy the land. He was under no duty to pay the first mortgage." Accord: Wade v. Beldmeir (1867) 40 Mo. 486; Fidelity & Deposit Co. v. Vance (1926) 135 Okl. 24, 245 P. 578. The authorities divide again on this subject. See, for example, Johnson v. Tootle, *supra,* and Joyce v. Dauntz, *supra,* which allow subrogation and repudiate the proposition that the purchaser is a volunteer. *Cf.* Weidner v. Thompson (1886) 69 Iowa 36, 28 N.W. 422.

This theory that the purchaser is a volunteer is, we think, entitled to little weight. The purchaser is advancing his money intending to get something for it, to wit, a title unencumbered by the lien to be discharged. It is hardly in accord with reality to say that he pays officiously, as an intermeddler.

■ Some courts rest their decisions against the right of subrogation at least in part upon the effect of subrogation upon the position of the junior lienor, saying that if subrogation is allowed his position is impaired; that is, that he has some right to rise to a primary position notwithstanding the circumstances involved, which right is defeated by allowing subrogation. See for this point of view: Fidelity & Deposit Co. v. Vance, *supra;* Smith v. Feltner, *supra.* To deny subrogation upon this ground seems to beg the question. The junior lienor had a right to advance if the prior encumbrance was paid off by one

not entitled to subrogation; he had no such right if the prior lien was satisfied by one entitled to subrogation. We have pointed out above that to allow subrogation does not *restrict* the effect of the record of the junior lien. And the following ,cases, which recognize the right of subrogation in situations like the one at bar, take the view that the junior lienor's position is not impaired when he is restored to his original position. They say, in effect, that he had no recognizable right to rise upon another's mistake. See Prestridge v. Lazar, *supra;* Wilson v. Kimball, *supra;* Joyce v. Dauntz, *supra;* Williams v. Libby, *supra;* Shaffer v. McCloskey, *supra; cf.* Barnes v. Mott (1876) 64 N.Y. 397, 21 Am.Rep. 625. This point of view is well expressed in Shaffer v. McCloskey, *supra,* where the court said:

"It will be noticed that the judgment in this case does not weaken any position which appellants [junior lienors] were induced to take by any conduct of the respondent [purchaser]. It does not take away from them any money which they were induced to invest by any act or laches of the respondent; nor does it lessen the value of any security which he in any way induced them to take. They did not acquire any lien after the mortgage had been marked satisfied, and were not led by a clear record to invest money in the land. They took the deed of trust while the mortgage was in full legal existence, recorded and unsatisfied, and with perfect understanding that it was a valid prior lien, and they are merely seeking to take an advantage offered by an inadvertence or mistake of respondent. This is what equity will not follow." [101 Cal. 576, at page 579, 36 P. 196 at pages 196, 197]

In Williams v. Libby this view was put still more trenchantly. After saying that when the junior lien attached it covered only the equity of redemption, and that since then the junior lienors had done nothing to enhance their security, the court continued:

"The only advantage they have gained is through the money paid by the plaintiff [the purchaser], without any consideration whatever moving from them. They claim the benefit, solely, through the mistake of the plaintiff. The bank [junior lienor] does not pretend to have earned a farthing of their claim. They simply say, the cold blood of the law permits them to take

$349.50 of the plaintiff's money." [118 Me. 80, at page 83, 105 A. 855, at pages 856–857] [5]

We think that to recognize equitable assignment does not impair any rights of the junior lienor worthy of equitable recognition against the position of one who in ignorance of the junior lien advances a part of purchase price to discharge a senior lien. For the only "rights" of the junior lienor that can be said to be actually impaired are gambling "rights" to profit by a purchaser's mistake. It should be noted, however, in the interest of clarity of reasoning in respect of the right of subrogation, that absence of injury to the junior lienor can hardly be regarded as a predicate for subrogation. Rather it is but a negative factor. That is to say, the right of subrogation in situations like that at bar, is founded on advance of money under mistake of fact and must rest on that affirmative foundation. It will not be recognized if innocent persons will be prejudiced. Therefore to say that the junior lienor is not harmed is but to say that no obstacle to subrogation, otherwise proper, exists on his account.

 Rejection of the grounds upon which some of the courts have denied subrogation in cases like that at bar does not, however, end the inquiry. For some courts have denied subrogation on the more tenable ground that the doctrine should be confined in its application to rather limited categories. E. g., Citizens Mercantile Co. v. Easom, supra; Fidelity & Deposit Co. v. Vance, supra. We are still put to a choice between the rule requiring strict application of the doctrine of subrogation, and the so-called benevolent or natural justice or liberal rule adopted in Hudson v. Dismukes, supra. We are obliged further to give more specific attention to the Federal cases, for in the interest of certainty in Federal law we should not, except for most cogent reasons, depart from a clear path already taken by the courts in the Federal system. If there were no Federal cases of highly persuasive character and no considerable number of authorities supporting the so-called liberal view, we should be much inclined toward accepting the strict one for this jurisdiction. Especially in the field of property transactions the decision of cases according to certain rules rather than according to the view of a chancellor as to what is equitable on the particular facts of each case is highly desirable. For, while the liberalization of law by equity was and is necessary and wholesome, it is not to be gainsaid that its price is an uncertainty of decision which should be extended with great caution. Moreover, the relief from their folly of those who in respect of contemplated property transactions do not consult available lien records seems more the task of the school than of the court.

 Turning to the Federal cases: Barnes v. Cady, mentioned above as one of the cases which, in allowing subrogation, reject the view that the purchaser who advances money to pay a lien is in effect paying his own debt, involved, in all material aspects, a situation paralleling the case at bar. In that case one C. W. Barnes and his wife and father, who jointly owned land encumbered by a mortgage executed by them in favor of the Fremont Savings Bank Company, executed a second mortgage in favor of the Ohio Savings Bank & Trust Company.[6] Thereafter the Fremont Bank foreclosed its mortgage, procured an order of sale and advertised for sale. In the meantime C. W. Barnes had agreed to transfer his interest in the property to John Barnes, in consideration of the latter's paying the Fremont Bank's judgment and court costs plus a small cash payment to C. W. Barnes. These two parties, having been advised by an attorney that the Fremont Bank foreclosure had shut out the interest of the Ohio Bank, paid up the claim of the Fremont Bank, procured an entry of satisfaction of the foreclosure judgment, and had a release and discharge of the Fremont Bank mortgage recorded. Thereafter the Ohio Bank commenced an action to foreclose its mortgage. John Barnes set up the above facts and upon them asserted a right of subrogation to the position of the Fremont Bank. The United States District Court for the Northern District of Ohio, Western Division, held that in paying the

---

[5] It will be noted that in the classification of cases in this opinion there is some repetition of citations. This is because some of the cases, in recognizing or denying the right of subrogation, express more than one ground for so doing. We have attempted, for convenience, to classify the cases according to such grounds.

[6] For convenience hereafter these companies will be referred to as the Fremont Bank and the Ohio Bank, respectively.

first mortgage John Barnes had paid his own debt and had thereby effectually extinguished the Fremont Bank mortgage and promoted the Ohio Bank's lien to first rank, and that he was not entitled to be subrogated to the previously existing senior rights of the Fremont Bank. The Sixth Circuit Court of Appeals reversed, saying: "It is manifest that in making such payment defendant intended to acquire, and supposed that he was acquiring, the interest in the premises held by the holder of such mortgage. He had not assumed the mortgage and was under no obligation, to either the mortgagor or mortgagee, to pay it. Nor was it his purpose to make a voluntary payment on behalf of such mortgagor. On the contrary, his sole object was the purchase of the land covered by this mortgage, which he supposed to be the only incumbrance thereon; and as one step in such purchase he sought, by paying the mortgagee to obtain the title of the holder thereof. In equity, therefore, he must be considered as the equitable assignee of such holder, and subrogated to the rights of the latter, as fully as if he had taken an actual assignment." [232 F. 318, at page 324]

The court also took the position that the discharge of record of the Fremont Bank mortgage was immaterial, saying on this topic:

"Nor is this right of defendant to be subrogated to the position of the owner of the mortgage so paid affected by the fact that such mortgage was discharged of record.

" 'In applying the doctrine of subrogation, no attention should be paid to technicalities which are not of an insuperable character, but the broad equities should always be sought out so far as possible.' Merchants' & Miners' Transp. Co. v. Robinson-Baxter-Dissosway Towing & Transp. Co., 191 F. 769, 113 C.C.A. 427.

"As was pointed out by Judge Taft in a similar case (Cameron v. Holenshade, 1 Cin.Super.Ct.R. [Ohio] 83):

" 'If the [purchasers], when they paid off these mortgages, had taken an assignment of them, instead of canceling them, they could have stood upon them as a plank with which to escape from the wreck. We think that, in the eyes of equity, their relation to junior incumbrances is not affected by the ceremony of canceling the mortgages. By paying them, under the circumstances of this case, they became substituted to the position of the mortgagees, so far as such a substitution was necessary to protect them from the injustice of having a junior incumbrancer force them to pay for their property more than once.' " [232 F. 318, at page 325]

The court next gave attention to the possible objection to subrogation that when the title of the property was conveyed to John Barnes after he paid the senior mortgage, his interests as equitable assignee and as owner of the legal title merged, with consequent advance of the junior mortgage. It disposed of this objection in the negative, saying:

"Did the subsequent conveyance to appellant of the interest of the mortgagor result in the extinguishment of the first mortgage by merger, and so promote the junior mortgage to seniority? We think not. As was said in Case v. Fant, 53 F. 41, 3 C.C.A. 418:

" 'The general rule is that a mortgage will not be merged or extinguished by a subsequent conveyance from the mortgagor to the mortgagee of the mortgaged premises unless such appears to have been the intention of the parties, and justice requires it.'

"In the language of the court in Duffy v. McGuiness, 13 R.I. 595:

" 'It is well settled that, in equity, where a mortgage passes by assignment to a purchaser of the equity of redemption, the two estates will not merge, if it is for the interest of the purchaser to keep them distinct, for protection against an intervening incumbrance, unless it be very clear that merger was intended.' " [232 F. 318, at pages 326, 327]

The court finally concluded:

"In the light of the foregoing authorities and of the principles of equity and good conscience by which we are here governed, we are of the opinion that the appellee is entitled to be subrogated, as against the appellants, to the rights of the holder of the mortgage paid, which must be considered as kept alive for their benefit so far as may be necessary to protect their interests. We think that appellant is entitled, in equity, to no less, and that appellees cannot, in equity, complain." [232 F. 318, at page 327].

The court here cited Shaffer v. McCloskey, supra, and quoted therefrom the language

which we quote above to the effect that the position of the junior lienor is not impaired.

One difference between Barnes v. Cady and the instant case on the facts is that in Barnes v. Cady the mortgage lien which was paid by John Barnes was owned by one having no other interest in the property, whereas in the instant case the lien which was paid off by the advance of purchase price by Burgoon was the lien of one, to wit Dorsey, who was the owner also of the equity of redemption conveyed by the Greens. We are unable to see, however, that this difference has any material bearing upon the question of the right of subrogation. Indeed, to permit this difference to defeat the right of subrogation would be to deny that the Dorsey lien could and did continue in existence despite the conveyance to Dorsey by the Greens. As we have pointed out above, the conveyance of the equity of redemption to the mortgagee will not effect a merger unless the parties so intend; and as we have also pointed out it is admitted, on the facts in the instant case that the Dorsey lien did continue in existence despite the conveyance. One other difference between Barnes v. Cady and the instant case is that in Barnes v. Cady John Barnes, the purchaser of the land, knew of the Ohio Bank mortgage as a matter of *fact,* but had been advised as a matter of *law* that it was extinguished by the Fremont Bank foreclosure. But that difference enhances the force of Barnes v. Cady as a precedent for the instant case.

We find no other Federal case directly in point, but there are other rulings by Federal courts which allow subrogation in still less orthodox situations than those of the instant case and Barnes v. Cady. In Stowers v. Wheat (C.C.A.5th, 1935) 78 F.(2d) 25, subrogation was allowed to the purchasers of bonds secured by a mortgage, where the money advanced by such purchasers was used to discharge the mortgage. Their interests were held superior to an intervening contractor's lien. In Rachal v. Smith (C.C.A.5th, 1900) 101 F. 159, cited in Barnes v. Cady, subrogation was allowed to one who at the request of a mortgagor advanced money to pay off the mortgage debt. There the reasoning was:

"Since the equitable doctrine of subrogation was ingrafted on the English equity jurisprudence from the civil law, it has been steadily growing in importance, and widening its sphere of application. It is a creation of equity, and is administered in the furtherance of justice. It is applied to give the party who actually pays the debt the full benefit and advantage of such payment. It has been long settled, and it is not controverted, that the doctrine applies where a junior incumbrancer discharges the prior incumbrance, and where the surety pays the debt of his principal, and in cases of like character. A just limitation of the application of the doctrine is that it does not apply to payments made by a mere volunteer or stranger. . . . The real question in all such cases is whether the payment made by the stranger was a loan to the debtor through a mere desire to aid him, or whether it was made with the expectation of being substituted in the place of the creditor. If the former is the case, he is not entitled to subrogation; if the latter, he is. If a person pays a debt at the instance, request, or solicitation of the debtor, he is neither a volunteer, stranger, or intermeddler; nor is the debt regarded as extinguished, if justice requires that it should be kept alive for the benefit of the one advancing the money, who thereby becomes the creditor.

\* \* \*

"If Francis Smith [the lender], instead of taking a release of the two mortgages, had taken an assignment of them, the question here discussed would never have been raised. As he paid off the mortgages at the request of the debtors, they would unquestionably have been assigned to him without recourse, had he requested it. He was entitled to an assignment. . . . If it be correct that Francis Smith's position was not that of a volunteer or stranger, then it is immaterial that a release, instead of an assignment, was made. Where the rights of innocent third persons have not intervened, the release will not prevent the person making the payment from becoming the equitable assignee of the claim paid." [101 F. 159, at pages 164–166]

See also a somewhat similar case, Edwards v. Davenport (C.C.S.D.Iowa, 1883) 20 F. 756.

These Federal cases clearly reflect the rule requiring liberal application of the doctrine of subrogation and we think they have so far committed the Federal courts to that rule that we ought not refuse to follow the equitable path they have chosen. Hence we feel obliged to recognize a

736

right of subrogation in the instant case. On the theory of the cases in the Federal courts—in particular Rachal v. Smith, *supra*—if Burgoon had taken an actual assignment from Dorsey of the second trust, there would have been no question that the Lavezzo third trust would have remained subordinate. Burgoon's failure to take an assignment must upon the facts have been due to her mistake of fact in respect of the existence of the Lavezzo trust. In these circumstances, according to the liberal theory of subrogation, it is just to recognize an equitable assignment, no intervening right having arisen, and Lavezzo's position being what it was at the outset.

Accordingly the decree of the trial court is reversed and the case remanded for further proceedings in accordance with this opinion, including a determination of the correct amount of the cash advanced by Burgoon. Costs will be divided.

Reversed and remanded.

MARTIN, Chief Justice, dissents.

VAN ORSDEL, Associate Justice, sat during the argument of this case, but died before the opinion was prepared.