**UNITED STATES of America,**
**Appellant,**

v.

**HALTON TRACTOR COMPANY, Inc., a**
**Corporation, and Wes Durston, Inc.,**
**a Corporation, Appellees.**

No. 15396.

United States Court of Appeals
Ninth Circuit.

July 23, 1958.

Rehearing Denied Sept. 15, 1958.

Charles K. Rice, Asst. Atty. Gen., Helen Buckley, A. F. Prescott, George F. Lynch, Attorneys, Department of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., Marvin D. Morgenstein, Asst. U. S. Atty., San Francisco, Cal., for appellant.

Henry M. Jones, Roy A. Sharff, San Francisco, Cal., for appellees.

Before STEPHENS, POPE and HAMLEY, Circuit Judges.

POPE, Circuit Judge.

Halton Tractor Company, Inc., a corporation, here called Halton, and Wes

Durston, Inc., a corporation, here called Durston, both filed actions seeking to recover, as wrongfully collected, sums which they paid to the Collector of Internal Revenue, for social security and withholding taxes owing by one Lloyd H. Watson. In each case judgment was for the plaintiffs from which the United States has appealed.

Prior to January, 1948, Watson, a contractor, had purchased from each of these corporations, various items of heavy machinery including tractors, scrapers and land levellers. To secure payment of the balance of the purchase price on such equipment, Watson had executed a conditional sales contract dated March 13, 1947, to Durston, and a conditional sales contract dated April 19, 1947, to Halton. He also executed under date of March 24, 1947, a chattel mortgage to Morris Plan Company describing certain other similar equipment, given to secure payment of a note for $47,100.[1] Durston assigned its conditional sales contract to C.I.T. Corporation, guaranteeing payment thereof.

On September 16, 1947, Watson was indebted to the United States for withholding and social security taxes in the sum of $9777.97. On that date the Government filed in the local county recorder's office its notice of tax lien against Watson. On September 29, 1947, pursuant to a request by Watson that Halton refinance his loan from Morris Plan so as to provide smaller payments over a longer period, Halton paid the balance due under the Morris Plan mortgage and on October 2, following, took a new chattel mortgage to itself covering the equipment described in the Morris Plan mortgage and a few additional items of equipment belonging to Watson. In November or December of that year Watson notified Halton and Durston that he was in default upon all these obligations. He then moved all of the equipment, here mentioned, including that purchased from Durston, to Halton's yards at Los Banos, California.

It appears that in the dealings with the Government or its agents, which followed, Edward H. Halton, President of Halton Tractor Company, acted not only on behalf of Halton but on behalf of Durston as well. These negotiations or dealings occurred in the month of January, 1948. At that time, Francis J. Reilly, a deputy collector of Internal Revenue, purported to seize all the machinery and equipment referred to as the property of Watson. He attached to each piece of machinery a tape on which was a written statement that it was "Property of the United States Government (Notice of Seizure)", and informed both Halton and Durston, through Halton, that he intended to proceed to sell the machinery and equipment to satisfy the indebtedness of Watson to the United States. The trial court found that Reilly then informed both plaintiffs that their claimed rights to the machinery were inferior to the rights of the United States under the latter's lien; that believing this statement to be true, and to save themselves from financial loss and to prevent the loss from sale of machinery and equipment, Halton paid to the United States the sum of $5877.97 and Durston paid the sum of $3900 (making the total sum of $9777.97 above mentioned). The court also found as follows: "VII. That at all times prior to and at the time of the payment of said sum of money by plaintiff to defendant, it believed that if said Francis J. Reilly proceeded to sell said equipment as he threatened, the same would be taken from the possession of plaintiff by the purchasers at such sale and forever lost to plaintiff. VIII. That said Francis J. Reilly, at said times prior to the payment of said sums of money by plaintiff to the defendant, informed plaintiff, and plaintiff believed that the only method by which plaintiff could proceed to protect its rights in the situation was by paying to the Depart-

[1]. The mortgaged property included Caterpillar tractors. Whether they were purchased by Watson from Halton does not appear. Halton was distributor for Caterpillar tractors in that area.

ment of Internal Revenue the amount of said taxes due from said Lloyd H. Watson and then file a claim for refund from the United States of America upon the ground it had paid the taxes due from someone else, to-wit, Lloyd H. Watson."

After these payments had been made, Halton and Durston proceeded to repair and recondition the machinery and equipment and sold it at retail prices realizing what they could from it. Each plaintiff duly filed its claim for refund of the aforesaid sums in the office of the Collector of Internal Revenue. The claims were rejected and these suits followed.

Upon this appeal the Government makes three contentions:

1. That the plaintiffs cannot recover because they volunteered to pay the taxes in question to obtain a release of the Government's lien, and in the absence of proof of payment under duress, (which it says was not present), recovery cannot be had;

2. Plaintiffs collected from their sales of the machinery sufficient sums to make them whole and having suffered no loss they cannot maintain these actions; and

3. That the Government's tax lien was superior to the lien of Halton Tractor Company.

In the court below the two cases were consolidated for trial and the appeals from the two judgments were argued together and presented in the same briefs. The questions raised here can be understood more readily if we treat each case separately, and since the appeal from the judgment in favor of Durston presents fewer questions than does the other case, we shall deal with that one first.

### The Appeal from the Judgment for Durston

As indicated above, when Durston paid the Government the $3900, its primary interest in the conditional sales contract covering the equipment sold by it was as guarantor of the paper which had been assigned to the C.I.T. Corporation. Later, in March, 1948, as the contract was in default, Durston was required to and did pay the amount then due on it or $30,100, and thus repurchased the contract. In August, 1948, Durston moved the equipment to Los Angeles where he reconditioned it and thereafter sold it for a total of $30,500. It had expended something over $1000 in replacing missing tires and parts. Thus Durston was out $30,100, the amount paid C.I.T. Corporation, plus $1000, or more. It is thus apparent that so far as Durston is concerned, it was then still out all of the sum it had paid on the Watson taxes.

It is also clear that Durston's interest in the equipment was at all times superior to the Government's claim of lien. Its rights stem from the conditional sales contract of March 13, 1947, and the Government's tax lien could not apply prior to its filing on September 16, thereafter. When Durston paid the $3900, it paid a sum for which it was in no manner responsible and which it was not required to pay in order to enforce its own claim against the property. To this extent this was a sum the Collector had "wrongfully collected" within the meaning of Sec. 3772 (a) (1), Int.Rev.Code, 1939,[2] Parsons v. Anglim, 9 Cir., 143 F.2d 534, 536, 154 A.L.R. 153.[3]

---

2. "§ 3772. Suits for refund—(a) Limitations (1) Claim. No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrong-fully collected until a claim for refund or credit has been duly filed with the Commissioner, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof." 26 U.S.C.A. § 3772 (a) (1).

3. This case is annotated at 154 A.L.R. 159.

616

■ The trial court met the Government's claim that recovery of this sum could not be had by Durston because the payment had been a voluntary one by treating that payment, as well as the payment by Halton, as one made under duress. The court's opinion states: "In view of these facts it is the opinion and conclusion of this Court that plaintiffs paid Watson's taxes under duress, since they acted under an immediate and urgent necessity to prevent a seizure of their property." Plainly the court regarded its findings, here quoted, as facts disclosing payments under duress. Its formal conclusions so stated.

If this question were one necessary to a decision of this case we would have no difficulty in holding that a finding of duress could not be said to be clearly erroneous. Here the deputy collector had undertaken to seize the equipment on which Durston had its lien by pasting stickers on each piece declaring it to be the property of the United States. From Durston's point of view, it was required to yield to the demand implicit in this unlawful seizure or else risk losing the opportunity to sell and liquidate the property in an orderly manner. A forced sale by the Government, as threatened, would have resulted in substantial loss to Durston whose one chance of getting out whole or anywhere near it was to recondition the property and sell it at retail. Under presently recognized rules of law duress may arise from "business compulsion". See Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478, 484, quoted in a footnote in Richfield Oil Co. v. United States, 9 Cir., 248 F.2d 217, 222; see also annotation, "Relaxation of the common law rule regarding recovery of voluntary payment", 75 A.L.R. 658; and the discussion in Swift & Courtney & Beecher Co. v. United States, 111 U.S. 22, 29, 4 S.Ct. 244, 247, 28 L.Ed. 341, quoting from Maxwell v. Griswold, 10 How. 242–256, 13 L.Ed. 405 as follows: "Now, it can hardly be meant, in this class of cases, that to make a payment involuntary, it should be by actual violence or any physical duress. It suffices,

if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly, and in consequence of that illegality, and without being able to regain possession of his property, except by submitting to the payment."

■ Under the rules previously laid down by this court, and its interpretation of the language of Sec. 3772, previously mentioned, proof of duress, as such, was wholly unnecessary here. Sub. (b) of Sec. 3772, provides: "Such suit or proceeding may be maintained, whether or not such tax, penalty, or sum has been paid under protest or duress." It would be difficult to find language more clear than this.

In Parsons v. Anglim, supra, this court had occasion to apply that section under circumstances which cannot be distinguished from those present in Durston's case. There the plaintiff, whose deceased husband had owed taxes for certain years from 1918 to 1927, paid the amount owing by the husband when she learned that the Commissioner was examining her husband's books with a view to determine a tax liability to the United States. She was advised that sooner or later it would be demanded that she pay the taxes and that if she paid them before a certain date she would save a substantial sum. After payment she filed claims for refund and then sued to recover the amount claimed. Calling attention to the provision of Sec. 3772 (b) that recovery could be had regardless of whether the amount of tax had been paid under protest or duress, this court proceeded to consider the trial court's holding that plaintiff could not recover because she paid the tax voluntarily and without threat, demand or coercion. It held that unless the moneys were voluntarily paid to the Collector, in the sense that they were intended to be donations by the person who paid for the benefit of the person who owed the taxes, the absence of coercion would be immaterial. The court said (143 F.2d at page 537): "It is obvious that it is the *volition of intent to donate* which is determina-

tive."[4] (at page 537): "Here, in a sense, the moneys are 'voluntarily paid' to the Collector, but it cannot be said that they are paid as a donation for the benefit of the original tax debtor."

It is clear that the holding in that case was that since the wife did not owe the taxes, and since they could not be collected from her or her property, the Collector in receiving her checks "wrongfully collected the taxes"; that the absence of coercion or duress on the part of the Collector, or the fact that payment was made on plaintiff's own volition, was wholly immaterial so long as it could not be said that the payment was made as a donation for the benefit of the original tax debtor.

It seems to us plain that the purpose of the provision making the showing of the protest and duress unnecessary was to indicate the Government's attitude that it would not insist upon retaining moneys which it had received when it had no right to collect them. "A fine sense of honor had brought the statute into being." Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265.[5]

■ The findings of the trial court are fully supported by evidence that the payment by Durston was not intended for the benefit of either Watson or the Government. It follows that under the authority of Parsons v. Anglim, supra, and the plain language of Sec. 3772(b), supra, Durston was entitled to the judgment which he recovered below.

### The Appeal from the Judgment for Halton

As previously indicated Halton paid to the United States the sum of $5877.97. This amount was paid under circumstances identical to those under which Durston, as stated above, paid its $3900. With respect to Halton's payment of this sum, the appellant makes the same argument it did with regard to Durston, namely, that Halton was a volunteer and, as such, it cannot now recover.

For the same reasons heretofore stated in dealing with Durston's appeal we reject this contention.

■ The Government urges some additional points on this appeal to which we now turn. It is contended that the Government's lien for taxes owed by Watson was superior and prior to the mortgage lien. As stated, Halton held a conditional sales contract covering a portion of the machinery and equipment. This was dated April 19, 1947. There is no claim here that the Government's lien was superior to that. Other portions of the equipment were described in the earlier chattel mortgage from Watson to Morris Plan Company; this was dated March 24, 1947 and duly recorded on March 29. It secured a loan of $40,000. There is no question but that the lien of that chattel mortgage, being earlier in point of time, was prior to the Government's lien for taxes. United States v. City of New Britain, 347 U.S. 81, 85, 74 S.Ct. 367, 98 L.Ed. 520.

The evidence shows, however, that at some time in September, 1947, apparently shortly after the Government's

4. The court said (at page 536) "We believe the Collector 'wrongfully collected' the taxes as that term is used in 26 U.S. C.A. Int.Rev.Code, § 3772(a) (1), (b), when he accepted appellant's tendered checks with knowledge of the fact that she did not owe the taxes. The protest that she did not owe them in the communication making the tender of the checks and claims for refund if the checks were accepted, refute the contention that she was volunteering a donation of her husband's taxes to the government."

5. In support of its contention that a "voluntary" payment cannot be recovered, appellant relies upon the same cases which this court distinguished in Parsons v. Anglim, supra, (footnote 1 thereof). Cf. with Clift & Goodrich v. United States, 2 Cir., 56 F.2d 751, one of those cases, the later case of Cloister Printing Corporation v. United States, 2 Cir., 100 F.2d 355, where is noted the effect of the enactment of the 1924 statute which is now Sec. 3772(b).

notice of tax lien against Watson had been filed, Watson went to Halton stating that he was delinquent in his payments to Morris Plan and that the latter had threatened to foreclose. He asked Halton if it would help him out by financing or buying the Morris Plan mortgage and entering into another deal with him whereby his payments would be extended over a longer period of time. Watson explained that he had a new construction contract which should produce enough funds to enable him to pay the mortgage. Mr. Halton testified that he made an agreement with Morris Plan by telephone that "I would put up the amount of the mortgage at our bank and the bank would handle an exchange of our money to them and the mortgage to us. And this we did." There was no written assignment of the Morris Plan mortgage. Halton received delivery of the mortgage papers through the Bank of America upon his payment of $25,930, the balance owing to Morris Plan. On October 2 following, Watson executed a new chattel mortgage to Halton covering the same equipment and machinery described in the Morris Plan mortgage; it also described some additional items of property,—an automobile and truck and four fuel tanks which we shall have occasion to refer to later. The mortgage was given to secure a promissory note in the sum of $28,000.

The position of the Government is that the execution of this new note and mortgage constituted a novation which operated to wipe out the former Morris Plan mortgage and that with respect to the property therein described Halton's liens did not arise until October 2, 1947, after the date when the Government's lien was filed. Hence, it is contended, with respect to that equipment and machinery, the Government in fact had a prior lien and was entitled to receive and collect the sums paid by Halton.

The trial court found that at the time the deputy collector made his demands on Halton, Halton was the owner of the Morris Plan mortgage. It is not apparent from the findings whether the court based this determination upon its belief that the Morris Plan mortgage was in fact assigned to Halton. It is Halton's contention here that apart from any actual assignment the facts and circumstances of the case show that Halton was entitled to be subrogated to the rights of the Morris Plan under its mortgage.

■■ The holding of the trial court that Halton was entitled to claim priority under the Morris Plan mortgage must be sustained. We are of the opinion that the trial court would have been justified in finding under the evidence here that the Morris Plan mortgage was in fact assigned, though informally, to Halton. Apart from that, however, it is clear that the circumstances here were such that Halton had the right to claim subrogation even in the absence of an assignment.

The facts in this case are almost precisely the same as those in the case of Potter v. United States, D.C.R.I., 111 F.Supp. 585. That case is useful here because of its clearly reasoned exposition of the rules relating to the right of subrogation, and because it collects and cites most of the leading federal cases bearing upon this question. It states the general rule as follows: "A person under no obligation who undertakes by agreement with an obligor to pay the latter's debt, with the understanding that he will have the same or equivalent security to that held by the original creditor, and subsequently pays that obligation, will be subrogated to the rights of the original creditor, provided that the entire transaction places no innocent third party in a position more unfavorable than that in which he originally stood." (at page 588)

In this case, as in that one, the would-be subrogee had no knowledge at the time it took its later mortgage that there was any claim or lien for taxes due the Government from the mortgagor, although in both cases notice of the lien had been filed. In the Potter case the court noted that the understanding that the recipient of the new mortgage would

have a first lien was evidenced by a warranty in the mortgage that the property was free and clear of encumbrances. Precisely the same warranty was in the October 2 mortgage here. Here, also, all of the circumstances of the dealings between Halton on the one hand, and Watson and Morris Plan, on the other, lead to but one possible inference,—that Halton understood it was to have the same security as that which Morris Plan had.

In the leading case of Burgoon v. Lavezzo, 68 App.D.C. 20, 92 F.2d 726, 735, 113 A.L.R. 944, the court discussed at great length the authorities bearing upon the right to subrogation under circumstances similar to those present here. It noted a diversity of opinion in various jurisdictions but concluded that the federal cases "clearly reflect the rule requiring liberal application of the doctrine of subrogation." The court proceeded to uphold the claim of subrogation in the case before it. That case is plain authority to support Halton's claim for subrogation here.

The so-called "liberal" application of the doctrine of subrogation found in the federal decisions is one which we may properly apply here without considering whether Halton's rights to claim subrogation ought to be judged by California law rather than by federal law.[6] Both the statutory and decisional statements of the law in California, with respect to the right of subrogation under these circumstances, are fully as liberal as that expressed in the federal decisions.[7]

The Government claims that Halton cannot rely upon subrogation because neither the rule applicable thereto, nor the Morris Plan mortgage, was mentioned in the claim which Halton filed with the Collector. The applicable regulation, Sec. 29.322–3, provides that: "The claim must set forth in detail and under oath the ground upon which a refund is claimed and facts sufficient to apprise the Commissioner with the exact basis thereof." In its claim Halton simply said: "That certain tractors and equipment belonging to Halton Tractor Company, Merced, California, were levied upon by the U. S. Treasury Department," etc., and that "In order to prevent distraint of the property owned by the Halton Tractor Company, the sum of $5,877.97 was paid to the Collector," etc.; that payment was made in order to prevent the sale of the equipment, "although Halton Tractor Company, a California corporation, was never itself liable for those taxes," etc.; and that Halton claimed refund because the taxes were paid involuntarily.

**6.** Cf. Commissioner of Internal Revenue v. Stern, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126, and United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, with United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L. Ed. 520. In United States v. Gregory-Beaumont Equipment Co., 8 Cir., 243 F. 2d 591, the court applied Arkansas law in supporting a claim of subrogation so as to sustain priority of a mortgagee against a Government crop loan mortgage.

**7.** The California statutes are quoted and the leading California decisions cited in Stein v. Simpson, 37 Cal.2d 79, 230 P.2d 816, 820, a case in which subrogation was denied. In Simon Newman Co. v. Fink, 206 Cal. 143, 273 P. 565, 566, the California rule was stated as follows: "The general rule respecting the rights of persons who advance money to pay off incumbrances is stated in 27 American &

English Encl. of Law (2d Ed.) at page 247, as follows: 'One who advances money to pay off an incumbrance on realty at the instance of either the owner of the property or the holder of the incumbrance, either on the express understanding, or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien on the property, is not a mere volunteer; and in the event the new security is for any reason not a first lien on the property, the holder of such security, if not chargeable with culpable and inexcusable neglect, will be subrogated to the rights of the prior incumbrancer under the security held by him, unless the superior or equal equities of others would be prejudiced thereby, and to this end equity will set aside a cancellation of such security, and revive the same for his benefit.' "

In our view the grounds stated by Halton for refund were clear. It was not obliged to set forth legal theories in filing its claim. The regulation is designed to apply to claims which are often prepared by laymen not learned in the law. The claim as filed here sufficiently apprised the Commissioner as to the exact basis thereof.

Finally it is contended that Halton may not recover here because it has suffered no loss in that it has recouped the amount of the taxes which it paid through sales of the repossessed equipment. What Halton did was to repair and recondition the machinery and equipment adding parts where needed and then sell the various items at retail. This required a period of approximately one year and Halton used its sales organization in the effort to find buyers and to dispose of the equipment. As of the last of January, 1948, there was due Halton on the conditional sales contract, $14,594.06; there was then due on mortgage, $23,-000.[8] Interest on those sums at that date were $351.78 and $562.27. Halton expended upon repairs of machinery and equipment, $6,517.37. The total of these sums is $45,025.48. It may be said that Halton was "in" that amount on account of machinery as of that date. Thereafter he proceeded to sell and the sales produced $57,807.97.

Included in those sales were six items which were not covered in the Morris Plan mortgage but which had been added in the October 2 mortgage from Watson to Halton. These were a Chevrolet and a Ford automobile and four Diesel fuel tanks with wagons. It is obvious that with respect to these six items of newly mortgaged property the Government's lien took precedence over Halton's claim. For the purpose of this computation we deduct the sales price received for the six items mentioned, $3,024.10, from the total cash received, $57,807.97, leaving a balance of $54,783.87, which is the gross sum realized by Halton from the sale of the machinery and equipment as to which it had liens prior to that of the Government.

In computing what it received as a result of these sales, Halton charges an item of $7,931.25, consisting of "Sales Department Operating Expenses", that is to say what it called a proportion of the expense of its organization, including salesmen, incurred in making the retail sales of the machinery and equipment here involved. This Halton contends was a normal cost of accomplishing sales of equipment at retail. It also charged to the transaction interest on the amounts owing on the mortgage and conditional sales contract from January 31, 1948 to the date that the equipment was sold, amounting to $1,935.27. When these last two items of costs are charged or added to $45,025.48, above mentioned, they make a total of $54,892.00, or a sum in excess of the $54,783.87, previously mentioned as the proceeds from the sale of the items to which Halton had priority.

The trial court filed an opinion prior to the making of its formal findings in which it expressed the view that these several items of expense incurred by Halton were properly charged by him. We think that in this the trial judge was correct; the charge for interest would appear to be proper under the principles which underlie Jefferson Standard Life Ins. Co. v. United States, 9 Cir., 247 F.2d 777. Cf. United States v. Lord, D.C., 155 F.Supp. 105.

The costs of repairs and sales organization expenses are proper charges under the terms of the conditional sales contract and Morris Plan mortgage. The conditional sales contract provided that "Upon default * * * the Company may at its option * * * retake possession of the equipment sold, ending all rights of the purchaser under this contract * * * and * * * resell * * * upon such terms and in such manner as the Company may determine. * * * The Company shall *deduct all expenses for retaking and selling such equipment* * * *." (Emphasis ours.)

8. Which mortgage it was we discuss later.

The Morris Plan mortgage also authorized resale and reimbursement to the mortgagee, "for all costs and charges incurred or expended by it. * * *"

Assuming as we have here that the total amount derived from the sales of equipment on which Halton had first claim was the amount stated above, it is apparent that those proceeds were not sufficient to reimburse Halton for any part of the taxes which he had paid to the United States. However, one fact which was not covered by the trial court's finding cannot be overlooked by us here: As noted above, the six items described in the October 2 mortgage, but not covered by the Morris Plan mortgage or conditional sales contract, were subject to the Government's prior lien. These were sold for $3,024.10. As to those items the Government should have been allowed credit against the amount for which Halton had judgment. Or, put another way, it can be said that when Halton paid the United States, $5,077.97, such portion of that as represented the proceeds of the six items was actually due the United States, and only the overplus was an amount wrongfully collected by the Collector.

There is one other respect in which we find the record here deficient. As previously noted, Halton paid Morris Plan when it took over that mortgage $25,930, which was the amount then owing to Morris Plan and which thereby became owing to Halton. The October 2, 1947, mortgage was given to secure the sum of $28,000. Whether this means that at that time Halton advanced to Watson an additional $2,070, or whether it was intended to cover some portion owing on the conditional sales contract, or whether it was simply a round figure, picked by the parties for convenience at the time, we cannot ascertain. Halton's office manager testified that as of January 31, 1948, there was $23,000 principal owing on the mortgage. He testi-

fied first that this was the amount owing on the Morris Plan mortgage and later corrected himself to say that it was the amount owing on the October 2 mortgage. It is evident that payments had been made since Halton paid the Morris Plan Company. How these payments were or should be credited as between the October 2 and the Morris Plan mortgage, this record does not show.

A problem similar to this arose in the case of Potter v. United States, supra, and the court there indicated, correctly, we think, that in calculating the right of subrogation it must be allowed in respect only to the amount owing upon the old mortgage. Since in any event the Halton judgment must be remanded to the court below for the purpose of calculating the proper amount of credit, as above indicated, to be applied against Halton's claim for refund, the court upon such demand will have an opportunity, by taking additional testimony if necessary, to ascertain the amount owing to Halton on the date mentioned on the Morris Plan mortgage, and to recalculate the recovery here on the basis of any new figure that might be thus ascertained.

It will also be appropriate for the court to ascertain whether the amount to be credited against the taxes paid by Halton should be the full sums received at the retail sales of the six items, that is to say, $3,024.10, or whether that sum should be reduced by the amount expended by Halton in the repair of some of the six items, or further reduced by any amount appropriately chargeable as "Sales Department Operating Expense."

The judgment in favor of Wes Durston, Inc., is affirmed.

Upon the appeal from the judgment in favor of Halton Tractor Company, Inc., that cause is remanded for further proceedings in the court below consistent with this opinion.