**EASTERN SAVINGS BANK, FSB, Appellant,**

v.

**Achilles PAPPAS, Mary Pappas West, Christy Papageorge, Appellees.**

No. 02–CV–676.

District of Columbia Court of Appeals.

Argued April 22, 2003.

Decided Aug. 14, 2003.

---

G. Vann Canada, Jr., Rockville, MD, for appellant.

Daniel S. Roth, with whom Kurt Berlin, Washington, DC, was on the brief, for appellees.

Before STEADMAN, SCHWELB, and RUIZ, Associate Judges.

SCHWELB, Associate Judge:

Eastern Savings Bank (Eastern) brought this action for a declaratory judgment to determine the priority of secured interests in real property as between East-

ern's Deed of Trust securing the payment of an indebtedness owed to Eastern by Vasiliki Pappas and a lien based on an earlier judgment against Vasiliki Pappas in favor of three judgment creditors. The trial court granted summary judgment in favor of the judgment creditors. On appeal, Eastern contends that its lien is entitled to priority over the creditors' lien pursuant to the doctrine of equitable subrogation. We agree, reverse, and remand.

## I.

In June 1980, Aphrodite Pappas, who was the owner of certain real property at 2507 33rd Street, N.W. in Washington, D.C., conveyed that property to Vasiliki Pappas in fee simple. Soon thereafter, Aphrodite Pappas died, leaving three children as heirs.[1] Vasiliki Pappas was named personal representative of Aphrodite Pappas' estate. In 1986, however, the Probate Court removed Vasiliki Pappas as personal representative on account of numerous improprieties on her part in exercising her fiduciary responsibilities. On April 18, 1990, Vasiliki Pappas executed a deed of trust on the 33rd Street property to secure a loan made to her by CitiBank Federal Savings Bank in the amount of $159,000.00 which was duly recorded.

In 1992, and again in 1996, the successor personal representative of Aphrodite Pappas' estate obtained judgments against Vasiliki Pappas in the Superior Court for breach of fiduciary duty. Each judgment was against Vasiliki Pappas personally, and not against her in her capacity as personal representative. These judgments were duly recorded in the land records, and they became effective as judgment liens against all real property titled in the name of Vasiliki Pappas. D.C.Code § 15–102(a) (2001).

Meanwhile, Vasiliki Pappas' financial difficulties continued, and by 1998, she was in serious default on the CitiBank Deed of Trust. CitiBank instituted foreclosure proceedings. On November 3, 1998, Vasiliki Pappas secured a loan from Eastern which had the effect of refinancing the earlier CitiBank loan, and she duly executed a promissory note in the amount of $168,000.00 payable to Eastern, $153,800.00 of which was used to discharge the earlier CitiBank loan. This note was secured by a new Deed of Trust of the same date.[2]

Certified Title Corporation (Certified) performed a title search on the property on behalf of Eastern in connection with the refinancing of the Vasiliki Pappas indebtedness. Certified discovered the first judgment, which had been secured by the Successor Representative of the Estate of Aphrodite Pappas against Vasiliki Pappas in the amount of $3,461.12. Certified mistakenly understood, and incorrectly represented to Eastern, that this judgment had been entered against Vasiliki Pappas solely in her capacity as the former Personal Representative of Aphrodite Pappas' estate. A duly recorded judgment against Vasiliki Pappas in the amount of $62,397.76, which had been entered by the Probate Division of the Superior Court in 1992, apparently was not discovered, or, at least, not related to Eastern, during the initial title search. The title examinations were performed by an independent abstractor retained by Certified, and Eastern did not receive any title documents which would have imparted actual knowledge of

---

1. The three heirs, who later became the judgment creditors, were Achilles Pappas, Mary Pappas West, and the late Frances Papageorge.

2. The interest rate on CitiBank's promissory note was approximately 10.5%; the rate on Eastern's note was 14.25%. See note 13, *infra.* In other respects as well, the terms of Eastern's note were less favorable to the debtor than the terms of CitiBank's note.

any judgment beyond the one for $3,461.12.[3]

Soon after executing the promissory note and Deed of Trust in favor of Eastern, Vasiliki Pappas defaulted on the Eastern loan. As CitiBank had done following Vasiliki Pappas' earlier default, Eastern instituted foreclosure proceedings. In connection with these proceedings, counsel for Eastern caused the title to be examined, and Eastern then actually learned for the first time that the judgment in favor of the heirs was against Vasiliki Pappas individually, and not in her capacity as Personal Representative of Aphrodite Pappas' estate.[4] It was also at this time that Eastern learned the full amount of Vasiliki Pappas' total judgment debt.

In March 1999, sixteen years after the death of Aphrodite Pappas, the Probate Court ordered the distribution to the heirs of portions of the judgments secured by the Successor Personal Representative against Vasiliki Pappas. On December 19, 2000, Eastern brought suit against the heirs, claiming that its lien was superior to their judgment liens under the principle of equitable subrogation. Eastern and the judgment creditors filed cross-motions for summary judgment.

On December 30, 2001, in an eight-page order, the trial court granted the heirs' motion for summary judgment and denied Eastern's motion for the same relief. Citing, *inter alia, Associates Fin. Servs. of America v. District of Columbia*, 689 A.2d 1217 (D.C.1997), the judge wrote that "the common law principle of 'first in time, first in right' governs competing creditors' claims against a property in the absence of an exception." She noted that the only statutory exception in the District is D.C.Code § 15–104 (2001), which provides that

> [t]he lien of a mortgage or deed of trust upon real property, given by the purchaser to secure the payment of the whole or any part of the purchase money, is superior to that of a previous judgment or decree against the purchaser.[5]

The judge raised, but found it unnecessary to resolve, the issue whether this statutory exception should be extended by the court to a lender like Eastern, who provides refinancing to the borrower by paying off and retiring a prior indebtedness. Relying on *Associates Fin. Servs.*, 689 A.2d at 1222, and on *Clay Properties v. Washington Post Co.*, 604 A.2d 890, 895 (D.C.1992) (*en banc*), the judge determined that "a crucial question in deciding the competing interests of lienholders and creditors is notice." The judge went on to hold that because the judgments were recorded Eastern "was on inquiry notice of the judgment against Vasiliki Pappas," that Eastern "did not acquire creditor status for value without notice," and that "[e]quity ... does not justify moving Eastern to a position superior to the Pappas defendants." The judge therefore granted summary judgment to the heirs. This appeal followed.

## II.

"Generally, priority of liens or security interests is determined according to the well-known principle of 'first in time, first in right.'" *Malakoff v. Washington*, 434 A.2d 432, 434 (D.C.1981) (citations

---

3. There is thus no claim in this case that Eastern, as distinguished from Certified, had actual rather than constructive notice of any judgment in favor of the heirs against Pappas in her individual capacity.

4. Following the institution of the present action, Eastern learned that other judgments which had been entered against Vasiliki Pappas had been assigned to the heirs.

5. The statute in the 2001 edition of the Code is unchanged from prior editions.

omitted). The question in this case is whether, and to what extent, this principle is affected by the doctrine of equitable subrogation.

In *G.E. Capital Mortgage Servs., Inc. v. Levenson,* 338 Md. 227, 657 A.2d 1170 (1995), the Maryland Court of Appeals explained that subrogation is

> the substitution of one person to the position of another, an obligee, whose claim he has satisfied. . . . The basic principles underlying subrogation are the same as those in constructive trusts, prevention of merger, and equitable liens, *i.e.,* restitution to prevent forfeiture and unjust enrichment.

G.E. Osborne, *Handbook on the Law of Mortgages* § 277, at 561 (2d ed. 1970) (Osborne). Although the doctrine of equitable subrogation may be applied in many contexts, one context involves the refinancing of a mortgage. Osborne states:

> Where a lender has advanced money for the purpose of discharging a prior encumbrance in reliance upon obtaining security equivalent to the discharged lien, and his money is so used, the majority and preferable rule is that if he did so in ignorance of junior liens or other interests he will be subrogated to the prior lien. Although stressed in some cases as an objection to relief, neither negligence nor constructive notice should be material.

Osborne, § 282, at 570.

*Id.* at 1172. The court stated that "[t]he great majority of case law holds that one who pays the mortgage of another and takes a new mortgage as security will be subrogated to the rights of the first mortgagee as against any intervening lienholder." *Id.* at 1175. *See also, e.g., Caito v. United California Bank,* 20 Cal.3d 694, 144 Cal.Rptr. 751, 576 P.2d 466, 471 (1978) (defining equitable subrogation).

In this jurisdiction, the doctrine of equitable subrogation was first applied to encumbrances on real property over a century ago. *See Taylor v. MacGreal,* 15 App. D.C. 32, 33 (1899). Thirty eight years later, in the leading case of *Burgoon v. Lavezzo,* 68 App.D.C.20, 92 F.2d 726 (1937),[6] the court applied the doctrine in a somewhat complex situation similar in principle to the one in the present case. The court held in *Burgoon* that where part of the purchase money for real property had been used to discharge an existing second mortgage, the purchaser[7] was entitled to subrogation of that mortgage as against the holder of an existing third mortgage which was a matter of record and of which the purchaser had constructive but not actual notice.[8] In reaching its decision, the court surveyed the authorities, already numerous in 1937, which had applied or refused to apply the doctrine of equitable subrogation where a lender or purchaser sought priority over intervening

6. In *United States v. Halton Tractor Co.,* 258 F.2d 612, 619 (9th Cir.1958), the court followed *Burgoon,* describing that decision as the "leading case."

7. *Burgoon* involved a purchaser rather than a refinancing lender, but this difference is not dispositive. In fact, *Burgoon* was cited in *G.E. Capital Mortgage Servs.,* 657 A.2d at 1175, a case involving refinancing by a mortgage lender, as supporting the proposition that "one advancing money . . . and taking a

new mortgage as security, is held to be entitled to subrogation to the prior lien as against the holder of an intervening lien of which he was excusably ignorant." *Metro. Life Ins. Co. v. Craven,* 164 Or. 274, 101 P.2d 237, 239 (1940).

8. "It is well settled that recording gives only constructive notice, not actual notice." *Han v. United States,* 944 F.2d 526, 530 (9th Cir. 1991).

liens. Citing *Hudson v. Dismukes*, 77 Va. 242, 246–47 (1883), the court explained that subrogation "is the creature of equity, and is founded upon principles of natural justice ... and is now applied in favor of all persons who are required to pay the debt of another to protect their own interests." 68 App.D.C. at 23, 92 F.2d at 729. The court in *Burgoon* was "unable to see how constructive notice to [the purchaser] of the [junior mortgagee's lien] could have anything to do with the right of the former to subrogation.... The question is: What is natural justice under the actual facts of the situation?" 68 App.D.C. at 24, 92 F.2d at 730 (quoting *Prestridge v. Lazar*, 132 Miss. 168, 95 So. 837, 838 (1923)).

The court found the issue whether equitable subrogation should be liberally or restrictively applied to be a very difficult one; in the court's view, principles of "benevolent or natural justice" were pitted against the policy of the law favoring consistency and predictability.[9] Nevertheless, the court followed the federal [10] majority rule, quoting at length from *Rachal v. Smith*, 101 F. 159, 164–66 (5th Cir.1900):

Since the equitable doctrine of subrogation was ingrafted on the English equity jurisprudence from the civil law, it has been steadily growing in importance, and widening its sphere of application. It is a creation of equity, and is administered in the furtherance of justice. It is applied to give the party who actually pays the debt the full benefit and advantage of such payment. It has been long settled, and it is not controverted, that the doctrine applies where a junior incumbrancer discharges the prior incumbrance, and where the surety pays the debt of his principal, and in cases of like character. A just limitation of the application of the doctrine is that it does not

**9.** The court stated:

We are still put to a choice between the rule requiring strict application of the doctrine of subrogation, and the so-called benevolent or natural justice or liberal rule adopted in *Hudson v. Dismukes, supra*. We are obliged further to give more specific attention to the Federal cases, for in the interest of certainty in Federal law we should not, except for most cogent reasons, depart from a clear path already taken by the courts in the Federal system. If there were no Federal cases of highly persuasive character and no considerable number of authorities supporting the so-called liberal view, we should be much inclined toward accepting the strict one for this jurisdiction. Especially in the field of property transactions the decision of cases according to certain rules rather than according to the view of a chancellor as to what is equitable on the particular facts of each case is highly desirable. For, while the liberalization of law by equity was and is necessary and wholesome, it is not to be gainsaid that its price is an uncertainty of decision which should be extended with great caution. Moreover, the relief from their folly of those who in respect of contemplated property transactions do not consult available lien records

seems more the task of the school than of the court.

68 App.D.C. at 27, 92 F.2d at 733.

**10.** *Burgoon* was decided one year before *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the court relied upon and applied the "federal" common law rather than District of Columbia precedent. Nevertheless, as noted, the court stated that it was determining what the law was to be "for this jurisdiction." At the time *Burgoon* was decided, the United States Court of Appeals for the District of Columbia was the highest court of the District of Columbia, and its decisions determined District of Columbia law. We therefore conclude, although the point may perhaps be debatable, that *Burgoon* is binding upon us under the rule of *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971).

The heirs contend the *Burgoon* has been "overshadowed" by *First Maryland Fin. Servs. Corp. v. District–Realty Title Ins. Corp.*, 548 A.2d 787 (D.C.1988) and by our *en banc* decision in *Clay Properties*, 604 A.2d at 895. *Burgoon* was not mentioned in either of these opinions, and the issues presented in these two cases were entirely different from the issues in *Burgoon* or in the case before us.

apply to payments made by a mere volunteer or stranger. . . .

If [the lender], instead of taking a release of the two mortgages, had taken an assignment of them, the question here discussed would never have been raised. As he paid off the mortgages at the request of the debtors, they would unquestionably have been assigned to him without recourse, had he requested it. He was entitled to an assignment. . . . If it be correct that [the lender's] position was not that of a volunteer or stranger, then it is immaterial that a release, instead of an assignment, was made. Where the rights of innocent third persons have not intervened, the release will not prevent the person making the payment from becoming the equitable assignee of the claim paid.

68 App.D.C. at 29, 92 F.2d at 735. The holding in *Burgoon* is controlling authority in the District of Columbia and it is our duty to follow it.

With respect to the issue here presented, the decision in *Burgoon* is also consistent with the RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.6 cmt e. (1997):

Perhaps the case occurring most frequently is that in which the payor is actually given a mortgage on the real estate, but in the absence of subrogation it would be subordinate to some intervening interest, such as a junior lien. Here subrogation is entirely appropriate, and by virtue of it the payor has the priority of the original mortgage that was discharged. This priority is often of critical importance, since it will place the payor's security in a position superior to intervening liens and other interests in the real estate. The holders of such intervening interests can hardly complain of this result, for it does not harm them; their position is not materially prejudiced, but is simply unchanged.

Many judicial opinions dealing with a mortgagee who pays a preexisting mortgage focus on whether the payor had notice of the intervening interest at the time of the payment. Most of the cases disqualify the payor who has actual knowledge of the intervening interest, although they do not consider constructive notice from the public records to impair the payor's right of subrogation. Under this RESTATEMENT, however, subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant.[11]

The Restatement further states, and we agree, that "[s]ubrogation will be recognized only if it will not materially prejudice the holders of intervening interests." *Id.*

 The heirs contend that they would be materially prejudiced if equitable subrogation were applied, because they had the right to expect, under the "first in time, first in right" rule, that their judgment liens would advance upon the satisfaction of CitiBank's lien and would therefore be superior to Eastern's lien, which was secured later in time. This contention was, however, explicitly rejected in *Burgoon*:

The junior lienor had a right to advance if the prior encumbrance was paid off by one not entitled to subrogation; *he had no such right if the prior lien was satisfied by one entitled to subrogation.*

68 App.D.C. at 26, 92 F.2d at 732 (emphasis added). Moreover, the court emphasized, as subsequently noted in the RESTATEMENT, that the intervening creditors

---

**11.** Because, albeit arguably on account of its own negligence or the negligence of Certified, Eastern did not have *actual* notice of the heirs' intervening liens, we need not decide whether to follow the majority rule (actual knowledge bars equitable subrogation) or the RESTATEMENT rule (it does not).

suffer no prejudice if equitable subrogation is applied:

> The only advantage they have gained is through the money paid by [the purchaser], without any consideration whatever moving from them. They claim the benefit, solely through the mistake of [the purchaser]. The [junior lienor] does not pretend to have earned a farthing of their claim. They simply say, the cold blood of the law permits them to take ... [the purchaser's] money.

We think that to recognize equitable assignment does not impair any rights of the junior lienor worthy of equitable recognition against the position of one who in ignorance of the junior lien advances a part of purchase price to discharge a senior lien. For the only "rights" of the junior lienor that can be said to be actually impaired are gambling "rights" to profit by a purchaser's mistake.

68 App.D.C. at 26–28, 92 F.2d at 732–33 (quoting *Williams v. Libby*, 118 Me. 80, 105 A. 855, 856–57 (1899)).[12]

The heirs argue that the interest rate of Eastern's note is far higher than that of CitiBank's, that the terms of Eastern's loan are more exacting, and that the heirs are thereby prejudiced because any funds available to them will be incrementally depleted as a result of the refinancing. Except as reflected in footnote 13, *infra*, this contention is unpersuasive. Eastern concedes in its Reply Brief, and counsel repeatedly acknowledged during oral argument, that Eastern is subrogated only to the extent that it was required to pay CitiBank to satisfy Vasiliki Pappas' indebtedness to CitiBank.[13]

---

**12.** In *Bennett v. Westfall*, 186 Md. 148, 46 A.2d 358, 361 (1946), the court emphasized, in somewhat sardonic fashion, the lack of any prejudice to junior lienors where a refinancing lender failed to examine title before releasing a second lien and taking a new mortgage:

> It is clear that appellee's failure to consult the Land Records in no way affected the appellant. It certainly did him no harm. If his contention is sustained in this case it will do him a great deal of good, and this, too, because of a mistake made by appellee in not consulting the Land Records. His position is: You made a mistake, it did me no harm; in fact, resulted in greatly benefit[t]ing me. Therefore, you can not have your mistake corrected. This position has no appeal to a court of equity. Negligence, therefore, if any there was, committed by appellee, caused no harm to the appellant and it is immaterial.

*Accord, G.E. Capital Mortgage Servs.*, 657 A.2d at 1177 (quoting *Bennett*).

**13.** On remand, however, we explicitly leave open the question whether, and to what extent, Eastern is entitled to equitable subrogation for *interest* on the $153,800.00 it paid CitiBank to release CitiBank's Deed of Trust. Eastern argues that it is entitled to be subrogated for "$153,800.00 together with interest thereon at the rate provided in the Note secured by the CitiBank Deed of Trust from the date that indebtedness was paid." The heirs do not address this point; their entire argument is focused on the question whether Eastern is entitled to equitable subrogation at all.

This issue is not an easy one, and turns on the perspective from which it is viewed. The Restatement provides that a "payor is subrogated only to the extent that the funds disbursed are actually applied toward payment of the prior lien. There is no right of subrogation with respect to any excess funds." RESTATEMENT (THIRD) OF PROPERTY, *supra*, § 7.6 cmt. e. In this case, Eastern was required to pay only a total of $153,800.00 to secure from CitiBank a release of CitiBank's lien. If Eastern is held to be entitled, under principles of equitable subrogation, to interest at the rate provided in the CitiBank Note, its rights as a subrogee will exceed the amount which was "actually applied [by Eastern] toward payment of the prior lien."

On the other hand, the focus of the Restatement is on whether subrogation will prejudice intervening lien holders. *See id.* CitiBank's Note provided for interest, and the Note itself was in an amount in excess of the $153,800.00 now claimed by Eastern. The heirs are therefore arguably better off *vis-a-vis* Eastern than they were *vis-a-vis* CitiBank, and they would suffer no prejudice even if the

■ In *Caito*, 144 Cal.Rptr. 751, 576 P.2d at 471, the Supreme Court of California, in a decision that we view, in this respect, as consistent with *Burgoon*, stated that equitable subrogation is appropriate where

(1) Payment [was] made by the subrogee to protect his own interest. (2) The subrogee [has] not ... acted as a volunteer. (3) The debt paid [was] one for which the subrogee was not primarily liable. (4) The entire debt [has] been paid. (5) Subrogation [would] not work any injustice to the rights of others.

*See also Han v. United States*, 944 F.2d 526, 529 (9th Cir.1991). Each of these conditions has been satisfied in this case. Eastern made the payment in its own interest. It did not act as a volunteer.[14] Eastern was not "primarily liable," or for that matter, liable at all for Vasiliki Pappas' debt to CitiBank. It satisfied CitiBank's entire debt. For the reasons stated in detail in *Burgoon*, in *Bennett, supra* note 12, 46 A.2d at 361, and in the RESTATEMENT, see pages 11–12, *supra*, subrogation would work no injustice to the judgment-creditor heirs, who would retain the precise security interest that they possessed at the time Eastern redeemed the indebtedness to CitiBank.

## III.

■ Relying on the opinion of the trial court, the heirs also contend that D.C.Code § 15–104, quoted on page 956, *supra*, which accords priority to "the lien of a mortgage or deed of trust upon real property, given by the purchaser to secure the payment *of the whole or any part of the purchase money*" (emphasis added), provides the sole exception in this jurisdiction to the principle "first in time, first in right." There is dictum in *District of Columbia v. Franklin Inv. Co.*, 404 A.2d 536, 540 (D.C.1979), which lends some support to the heirs' contention; the court in that case described it as "axiomatic that a prior lien gives a prior legal right ('first in time, first in right'), *except where statute varies the common law rule.*" (Emphasis added; citations omitted.) But the *Franklin Investment* case did not involve equitable subrogation, and the court made no mention at all of *Burgoon*. We do not think that the *Franklin Investment* dictum is controlling here, or that the court had in mind a situation like the one now before us.

Section 15–104 addresses an issue materially different from the question presented in equitable subrogation cases. The statute has to do with the debts of *the*

court were to hold that Eastern is subrogated to the amount of $153,800.00 plus interest. *Cf. Am. Nat'l Bank v. Clark*, 11 Neb.App. 722, 660 N.W.2d 530, 537 (2003) (noting plain error where the trial court awarded interest at the legal rate rather than the contractual rate; the option of no interest at all was not discussed).

The precise issue that we have identified in this footnote has not been addressed by the parties, and there has thus been no adversarial crossing of swords. We therefore decline to resolve the issue as an initial matter on appeal, and instead leave it to the trial court to decide it, in the first instance, on remand, following appropriate briefing by the parties.

We also note that the sole indicator in the record as to the interest rate on CitiBank's

Note is an affidavit of the debtor stating that the loan "had an interest rate of *about* 10.5% per year." (Emphasis added.) If necessary, the trial court should, upon remand, ascertain the precise interest rate specified in CitiBank's Note.

**14.** The court stated in *Burgoon*:

This theory that the purchaser is a volunteer is, we think, entitled to little weight. The purchaser is advancing his money intending to get something for it, to wit, a title unencumbered by the lien to be discharged. It is hardly in accord with reality to say that he pays officiously, as an intermeddler.

68 App.D.C. at 26, 92 F.2d at 732.

*purchaser* of real property, and provides that when a purchaser gives a purchase money mortgage to secure all or part of the purchase price, the lien on that property takes priority over pre-existing liens held by other creditors of the purchaser which would otherwise attach to the property as soon as the buyer receives title, and which, under the maxim of first in time, first in right would outrank the purchase money lien.

▪ Equitable subrogation, on the other hand, addresses the priority of liens held by creditors of *the owner* of property. The doctrine is applied where the subrogee effectively stands in the shoes of the original lienholder, and where the failure to apply it would unjustly enrich prior judgment creditors at the subrogee's expense. This purely equitable issue does not arise in cases governed by § 15–104.

Because the statute and the equitable doctrine address distinctly different issues, the courts that sustained equitable subrogation in the decisions discussed in this opinion did not mention the existence of § 15–104 or of its analogue in other jurisdictions. When *Burgoon* was decided, for example, D.C.Code § 24–328 (1929)—the predecessor of § 15–104—provided that "the lien of the [purchase money mortgage] or deed of trust on the property shall be superior to that of a previous judgment or decree against the purchaser." The statute did not address the issue presented in *Burgoon,* and the court consequently did not address or discuss, or even cite the statute. Similarly, when the Maryland Court of Appeals held in the *G.E. Capital Mortgage Services* case that a refinancing mortgage lender without actual notice of the liens of earlier judgment creditors had priority over those creditors' liens, 657 A.2d at 1172, a Maryland statute analogous to § 15–104 provided that a purchase money mortgage "shall be preferred to any previous judgment or decree for the

payment of money which is obtained against the purchaser." MD. CODE ANN., REAL PROPERTY § 7–104. As in *Burgoon,* the court had no occasion to discuss this statute, which concerned prior judgments against the purchaser, while describing and applying equitable subrogation as between the mortgage lender and the seller's judgment creditors.

▪ In essence, the heirs seek to apply the Latin maxim of *"expressio unius est exclusio alterius"* to the provisions of § 15–104. They argue, in substance, that the statutory exception to "first in time, first in right" is, by implication, the *only* such exception. However, "[t]he *expressio unius* maxim ... must be applied with a considerable measure of caution." *Council of the District of Columbia v. Clay,* 683 A.2d 1385, 1390 (D.C.1996) (citation omitted). Because the doctrine of equitable subrogation is concerned with an issue that does not arise under the statute, and because the doctrine and the statute have co-existed in this and other jurisdictions for many decades without any suggestion that the statute implicitly limits the equitable doctrine in any way, we conclude that this contention on behalf of the heirs cannot carry the day.

## IV.

For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*