AMERIQUEST MORTGAGE COMPANY v ALTON
ALTON v AMERIQUEST MORTGAGE COMPANY

Docket Nos. 264213, 264214. Submitted February 14, 2006, at Detroit.
Decided July 25, 2006, at 9:15 a.m. Vacated in part 271 Mich App
801.

Arkan Alton and Ameriquest Mortgage Company brought separate
actions in the Oakland Circuit Court to quiet title to a parcel of
real property formerly owned by Samir Yousif. Yousif had obtained
a $225,000 mortgage from Franklin Funding, which was recorded
in March 2002, and a second mortgage for $86,000 from Alton,
which was recorded in March 2003. In May 2003, Yousif obtained
a third mortgage from Ameriquest for $294,300 after signing an
affidavit indicating that the Franklin mortgage was the only
encumbrance on the property, despite the existence of the Alton
mortgage. Yousif used a portion of the Ameriquest loan to pay off
the Franklin loan, then defaulted on the Alton and Ameriquest
loans. Alton foreclosed on his mortgage and acquired a sheriff's
deed to the property. The trial court, Rudy J. Nichols, J., ruled that
Ameriquest was entitled to a first priority lien on the property
under the doctrine of equitable subrogation, reasoning that extin-
guishing Ameriquest's claim would leave Alton, who knew that his
lien was secondary to the Franklin mortgage, with a substantial
windfall, while granting Ameriquest's claim would preserve Al-
ton's title to the property subject to the amount Ameriquest paid
to discharge the Franklin loan. Alton appealed by right the trial
court's grant of summary disposition.

The Court of Appeals *held*:

1. MCR 7.215(J)(1) requires the Court to follow the rule in
*Washington Mut Bank, FA v ShoreBank Corp*, 267 Mich App 111
(2005), which would compel the conclusion that Ameriquest was a
"volunteer payor" and, therefore, was not entitled to equitable
subrogation. Were it not bound to follow this rule, the Court would
adopt the position set forth in § 7.6 of the Restatement of Property
(Mortgages), 3d, that the doctrine of equitable subrogation may be
applied to a refinanced mortgage to prevent unjust enrichment,
even in cases involving sophisticated lenders such as financial
institutions.

2. Ameriquest's failure to discover Alton's mortgage by updating its title search immediately before closing was not reflective of neglectful conduct that precludes equitable relief, particularly given Yousif's affidavit that there was only one lien on the property.

Reversed.

*Douglas A. Tull, P.C.* (by *Douglas A. Tull*), for Arkan Alton.

*Dykema Gossett PLLC* (by *Laura C. Baucus, Jill M. Wheaton,* and *Douglas J. Fryer*) for Ameriquest Mortgage Company.

Before: HOEKSTRA, P.J., and NEFF and OWENS, JJ.

NEFF, J. In these consolidated appeals involving competing declaratory judgment actions to quiet title to a parcel of real property, Arkan D. Alton[1] appeals by right the July 19, 2005, trial court order granting summary disposition to Ameriquest Mortgage Company on the basis that the mortgage held by Ameriquest had priority over the mortgage held by Alton under the doctrine of equitable subrogation. We reverse, but only because we conclude that *Washington Mut Bank, FA v Shore-Bank Corp,* 267 Mich App 111; 703 NW2d 486 (2005), compels reversal on the ground that Ameriquest was a "volunteer" payor and, therefore, was not entitled to equitable subrogation. Were we not bound by the decision in *Washington Mut Bank,* we would affirm the trial court's decision pursuant to the Restatement of Property view that the doctrine of equitable subrogation may be applied in circumstances of a refinanced mort-

---

[1] The parties filed separate declaratory judgment actions, which were consolidated in the trial court. Because Alton is the defendant in Docket No. 264213 and the plaintiff in Docket No. 264214, this opinion references the parties by name to avoid confusion.

gage. We therefore declare a conflict with *Washington Mut Bank* pursuant to MCR 7.215(J)(2) to urge further consideration of the doctrine of equitable subrogation in the circumstances presented.

I

These cases arise from competing claims to quiet title to real property at 22230 Ivanhoe Lane in Southfield. The property's title history is fairly complicated; however, the essential facts and claims were aptly summarized by the trial court:

> On February 21, 2002, the former owner, Samir Yousif, hereinafter Yousif, obtained a loan in exchange for a mortgage from Franklin Funding, hereinafter Franklin, in the amount of $225,000 plus interest. The mortgage was recorded March 11, 2002, and subsequently assigned to Equity One.
>
> On February 13, 2003, Yousif and his wife obtained a loan and mortgage from Defendant, Arkan D. Alton, hereinafter Alton, in the amount of $86,000 which was recorded March 21, 2003.
>
> Subsequently, Yousif obtained a loan and mortgage from Ameriquest Mortgage [C]ompany, hereinafter Ameriquest, in the amount of $294,300, plus interest, which was recorded May 1, 2003.[2] The funds from the Ameriquest loan were allegedly used to pay off the Franklin loan and a discharge [of mortgage] was recorded in the Register of Deeds [on] September 18, 2003.
>
> During this time, Yousif defaulted on the Alton and Ameriquest loans, and Alton foreclosed the Alton mortgage by way of advertisement on September 2, 2003, with a Sheriff's Deed recorded September 9, 2003, prior to the discharge of the Franklin loan being recorded.

---

[2] At closing, Yousif executed an affidavit of title indicating that, aside from the Franklin mortgage, there were no other encumbrances on the property, despite the outstanding mortgage with Alton.

. . . Ameriquest argues it's entitled to step into the first lien position of Franklin under the doctrine of Equitable Subrogation, even though Ameriquest's mortgage was dated and recorded after the Alton mortgage.

Ameriquest argues that Yousif used $241,337.51 to pay off the first lien, and Ameriquest should be entitled to a first lien position to that amount of the mortgage. Ameriquest argues that the result, as it stands, creates an improper windfall to Alton. Ameriquest relies on Alton's deposition testimony in which he admits that his loan to Yousif was a junior mortgage and subordinate to the Franklin loan.

Alton responds and argues in [his] motion for summary disposition that the Ameriquest mortgage was allegedly not signed by Yousif and that the mortgage falsely states that Yousif is a single man.[3] Alton argues that Ameriquest's payoff to Franklin was voluntary and that foreclosure wiped out Ameriquest's mortgage as a matter of law.

In resolving the parties' competing claims, the trial court concluded that Ameriquest was entitled to a first priority lien on the property in the amount of $241,337.51 under the doctrine of equitable subrogation. Ameriquest therefore "stepped into the shoes" of Franklin on the basis of Ameriquest's payoff of the Franklin loan, which had priority over the mortgage held by Alton.[4]

---

[3] The title history reflects transactions by Yousif as a single man, although he was married, and further reflects that although Yousif's wife executed a quitclaim deed transferring her interest in the property to Yousif, she later joined with Yousif in mortgaging the property. Although the parties dispute the import of certain questionable transfers, the parties agree that these transactions are not directly relevant to the questions before us.

[4] On March 24, 2003, at Yousif's request, $241,337.51 of the proceeds of the Ameriquest mortgage were paid by Ameriquest to discharge the Franklin mortgage.

The court noted that Alton's mortgage, with interest, was $92,863.42, while the property was appraised at $300,000. Therefore, if Ameriquest's claim were extinguished, Ameriquest would be substantially prejudiced and Alton would receive a proportionate windfall. Conversely, granting Ameriquest's claim would not invalidate Alton's title acquired through the sheriff's sale, but would only preserve an encumbrance on the property in the amount paid by Ameriquest to discharge the Franklin loan. The court noted that Alton knew of the Franklin encumbrance when he gave his loan to the Yousifs; he was aware that it was later paid off and discharged; and he apparently believed the windfall he received was a "gift from God." The trial court granted summary disposition in favor of Ameriquest.

II

A trial court's decision concerning equitable issues, including an action to quiet title, is reviewed de novo. *Deutsche Bank Trust Co Americas v Spot Realty, Inc*, 269 Mich App 607; 612; 714 NW2d 409 (2006); *Webb v Smith (After Remand)*, 204 Mich App 564, 568; 516 NW2d 124 (1994). Findings of fact supporting the decision are reviewed for clear error. *Id*.

A trial court's decision to grant or deny summary disposition is also reviewed de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In deciding a motion for summary disposition brought under MCR 2.116(C)(10), the court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314

(1996). If the nonmoving party fails to establish an issue of material fact, the motion is properly granted. *Id.*

III

The circumstances before us are not atypical in the context of financing real property. The question in general terms is whether a mortgagee that loans money to refinance real property may be entitled to the prior lender's priority lien position, thereby acquiring a superior position to an intervening junior mortgagee.

In *Washington Mut Bank*, the Court answered this question in the negative. The Court held that the doctrine of equitable subrogation does not apply to permit a new mortgage, granted as part of a generic refinancing transaction, to take the priority of the original mortgage, which is being paid off, thereby giving the new mortgage priority over intervening liens. *Washington Mut Bank, supra* at 128.

A

In *Washington Mut Bank*, the Shinas refinanced their home by obtaining a $392,000 mortgage from the plaintiff, secured by the Shinas' home. *Id.* at 112. Most of the loan proceeds were used to satisfy and discharge the first mortgage on the property, held by Option One Mortgage Corporation. *Id.* However, the plaintiff reportedly "was unaware of the fact that, *at the time it made the loan* to the Shinas, there were two other mortgages recorded against the property," a $200,000 mortgage in favor of the defendant, and a $249,000 mortgage in favor of Standard Federal Bank. *Id.* (emphasis added). Both mortgages were recorded before the

plaintiff's mortgage but after the Option One mortgage, although the plaintiff somehow failed to discover their existence. *Id.*

When the Shinas defaulted on their loans and the property went into foreclosure, the plaintiff sought to be equitably subrogated to the priority position of the Option One mortgage because the proceeds of its loan were used to pay off the Option One mortgage. *Id.* at 112-113. This Court held that equitable subrogation was inapplicable in light of existing Supreme Court precedent. *Id.* at 119-120, 128.

Conducting an extensive review of Michigan case law, the Court concluded that, with the exception of *Walker v Bates*, 244 Mich 582, 587; 222 NW 209 (1928), no Michigan court has held that subrogation was available to a payor who merely provides refinancing to pay off a prior loan. *Washington Mut Bank, supra* at 128. Although the Court acknowledged that the doctrine of equitable subrogation was applied to a claim involving a refinanced mortgage in *Walker*, the Court nevertheless found an irreconcilable conflict between *Walker* and *Lentz v Stoflet*, 280 Mich 446; 273 NW 763 (1937), decided nine years later. The Court noted that both opinions were authored by Justice Edward SHARPE, and appeared to be the last two Supreme Court decisions addressing the question of equitable subrogation in a mortgage priority context. *Washington Mut Bank, supra* at 114-119. Given this perceived conflict, the Court found that it was obligated to follow *Lentz*, the most recent decision, and therefore the plaintiff was not entitled to equitable subrogation because it was a mere volunteer. *Id.* at 119-120.

The Court concluded:

> In sum, with the exception of *Walker*, we are unaware of any authority regarding the application of the doctrine of

equitable subrogation to support the general proposition that a new mortgage, granted as part of a generic refinancing transaction, can take the priority of the original mortgage, which is being paid off, giving it priority over intervening liens. And, as for *Walker*, as Justice POTTER stated in his concurrence in *Lentz, Walker* "is not a precedent to be followed, but an accident to be avoided." Such bolstering of priority may be applicable where the new mortgagee is the holder of the mortgage being paid off or where the proceeds of the new mortgage are necessary to preserve the property from foreclosure or another action that would cause the intervening lien holders to lose their security interests. But neither of those circumstances exists here. Therefore, plaintiff is not entitled to be subrogated to the original mortgage and receive priority over the intervening lienholders. Accordingly, the trial court properly granted summary disposition for defendants. [*Washington Mut Bank, supra* at 128.]

It is undisputed that if the rule of *Washington Mut Bank* prevails in this case, Alton receives a windfall in taking claim to the Ivanhoe Lane home valued at more than $300,000 against his loan of only $86,000, while Ameriquest suffers a loss of $241,337.51 used to repay the Franklin loan, even though Alton knew of the existing Franklin mortgage in making the $86,000 loan and knew that his lien was secondary. That this result is inequitable in the extreme cannot be ignored.

B

Contrary to the holding in *Washington Mut Bank*, the Restatement of Property, 3d, recognizes that equitable subrogation is properly allowed under the circumstances of this case. "Subrogation is an equitable remedy designed to avoid a person's receiving an *unearned windfall* at the expense of another." Restatement Property (Mortgages), 3d (the "Restatement"), § 7.6, comment a, p 509 (emphasis added). One who performs a

mortgage is entitled to subrogation in order to avoid unjust enrichment.[5] Restatement, § 7.6, p 508. The Restatement rule of subrogation in this context states:

> (a) *One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment.* Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.
>
> (b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:
>
> (1) in order to protect his or her interest;
>
> (2) under a legal duty to do so;
>
> (3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or
>
> (4) *upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.* [Restatement, § 7.6, p 508 (emphasis added).]

We conclude that the Restatement rule is the better view, and, as the trial court concluded, permits Ameriquest to assume the first lien position of the prior lender under the doctrine of equitable subrogation. A contrary result would bestow an unsupportable windfall on Alton, unjustly enriching him.

We recognize that the rules of the Restatement are not necessarily coincident with the law of this state:

---

[5] To show "unjust enrichment, plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp v City of Detroit*, 256 Mich App 463, 478; 666 NW2d 271 (2003).

"Unlike a statute which expresses a legislative directive for the treatment of future cases, the Restatement seeks primarily to distill the teachings of decided cases and is descriptive. . . . Even where a particular Restatement section has received specific judicial endorsement, cases where that section is invoked must be decided by reference to the policies and precedents underlying the rule stated." [*Fultz v Union-Commerce Assoc*, 470 Mich 460, 464-465; 683 NW2d 587 (2004), quoting *Smith v Allendale*, 410 Mich 685, 713; 303 NW2d 702 (1981).]

We must therefore reconcile the specific principles expressed in the Restatement with our case law that limits their breadth. *Id.* at 465; see also *Zsigo v Hurley Med Ctr*, 475 Mich 215, 224-227; 716 NW2d 220 (2006) (declining to adopt an exception to the respondeat superior rule of employer nonliability found in 1 Restatement Agency, 2d, § 219(2)[d]).

However, the evolution of Michigan law concerning equitable subrogation in the context of mortgages is unclear and the extent to which the Restatement view is reflective of our state's jurisprudence has not been addressed.[6] In *French v Grand Beach Co*, 239 Mich 575, 580-581; 215 NW 13 (1927), relied on by both *Walker* and *Lentz*, our Supreme Court stated:

The doctrine of subrogation rests upon the equitable principle that one who, in order to protect a security held by him, is compelled to pay a debt for which another is primarily liable, is entitled to be substituted in the place of and to be vested with the rights of the person to whom such payment is made, without agreement to that effect. This doctrine is sometimes spoken of as "legal subrogation," and

---

[6] Contrary to *Washington Mut Bank, supra* at 128, this Court has recognized a right to subrogation in a case similar to this, albeit in an unpublished decision. See *Eastern Savings Bank v Monroe Bank & Trust*, unpublished opinion per curiam of the Court of Appeals, issued November 26, 2002 (Docket No. 231886), slip op at 3-4, on which both Ameriquest and the trial court relied in this case.

has long been applied by courts of equity. *Stroh* v. *O'Hearn*, 176 Mich. 164, 177 [142 NW 865 (1913)]. There is also what is known as "conventional subrogation." It arises from an agreement between the debtor and a third person whereby the latter, in consideration that the security of the creditor and all his rights thereunder be vested in him, agrees to make payment of the debt in order to relieve the debtor from a sacrifice of his property due to an enforced sale thereof. It is wholly independent of any interest in the property which the lender may have to protect. It does not, however, inure to a mere volunteer who has no equities which appeal to the conscience of the court. In speaking of subrogation, it was said in *Stroh* v. *O'Hearn, supra:*

> "It is proper in all cases to allow it where injustice would follow its denial, and in allowing it all injustice should be guarded against so far as possible." [See also *Washington Mut Bank, supra* at 113.]

Although this excerpt from *French* has often been repeated, the distinctions and the tests have become blurred. In *Walker*, the Court applied the above concept of conventional subrogation in concluding that subrogation was appropriate in the context of a mortgage discharged after refinancing:

> At the time of the execution of the mortgage to the savings bank on January 4, 1921, it drew its cashier's check for $6,095, payable to the Bank of Detroit, the successor of the Highland Park State Bank, of which $4,095 was used in payment of its mortgage. The discharge was executed on January 5th and recorded the following day. To that extent I think the savings bank should be subrogated to the rights of the State bank. *This is what is known in law as "conventional subrogation."* This question was so fully considered in the recent case of *French* v. *Grand Beach Co.,* 239 Mich. 575, that I refrain from further discussion and content myself with a brief quotation therefrom:
>
> > "It arises from an agreement between the debtor and a third person whereby the latter, in consideration that the

> security of the creditor and all his rights thereunder be vested in him, agrees to make payment of the debt in order to relieve the debtor from a sacrifice of his property due to an enforced sale thereof. It is wholly independent of any interest in the property which the lender may have to protect. It does not, however, inure to a *mere volunteer who has no equities which appeal to the conscience of the court.* [*Walker, supra* at 586-587, quoting *French, supra* (emphasis added).]

In *Lentz,* the Court reiterated the distinction between legal and conventional subrogation discussed in *French,* but further explained:

> *The theory of equitable or conventional subrogation is that the junior lienor's position is left unchanged by the conduct of the party seeking subrogation and that he is not wronged any by permitting subrogation.* An examination of the facts involved in this cause in the light of the above rule shows that the total amount of money which Stoflet and wife owed to the Rockwood State Bank on May 22, 1930, was $6,399.01 and that the indebtedness incurred by Stoflet and wife in the transaction with plaintiffs was $16,000. The mortgages formerly held by the Rockwood State Bank covered only 94.72 acres of land while plaintiffs' mortgage not only incumbered 68.49 acres of the above mentioned land but also 35.90 acres of land owned by Stoflet and wife in addition thereto. The possibility of realizing on any deficiency judgment or decree granted against Stoflet and wife would be lessened because of plaintiffs' prior lien. When plaintiffs loaned the money they had no interests to protect. *It was done without any agreement or understanding that they were to enjoy the fruits of subrogation. It was voluntarily done upon their part and to grant it would not leave defendant in its former position.* A mere volunteer is not entitled to subrogation. [*Lentz, supra* at 451.]

Both *Walker* and *Lentz* acknowledge that subrogation does not "inure to a mere volunteer *who has no equities*

*which appeal to the conscience of the court.*"[7] *Lentz,
supra* at 450; *Walker, supra* at 587 (emphasis added).
However, as the Restatement points out, the difficulty
rests in what constitutes a "mere" volunteer, i.e., *who
has no equities which appeal to the conscience of the
court*:

> Prior case law has often indicated that one who pays as
> a "volunteer" is not entitled to subrogation. However, the
> meaning of the term "volunteer" is highly variable and
> uncertain, and has engendered considerable confusion.
> This Restatement does *not* adopt the "volunteer" rule, but
> instead requires simply that the subrogee pay to protect
> some interest. [Restatement, § 7.6, comment b, p 512
> (emphasis added).]

That is not to say that a voluntary payor's right to
subrogation is without limits. As the Restatement also
acknowledges, "[w]hile the concept of 'interest' is
broadly defined, it does not cover every conceivable
payor." Restatement, comment b, p 513. "A true 'inter-
meddler' who has no legitimate need or reason to pay
the mortgage debt is not entitled to subrogation." *Id.*

Early pronouncements of our Supreme Court on the
subject of equitable subrogation reflect many of the
same fundamental considerations incorporated in the

---

[7] Contrary to the conclusion in *Washington Mut Bank* that *Walker* and
*Lentz* are irreconcilable, given the analysis from *Lentz*, the distinction
between *Walker* and *Lentz* appears to be based in part on the absence of
any agreement for subrogation in *Lentz*. "[I]t is generally held that one
paying the debt of another pursuant to an agreement, express or *implied,*
for subrogation is not a volunteer, and is entitled to subrogation to the
creditor's rights." 29 Michigan Law and Practice, Subrogation, § 1, p 534,
citing *Walker, supra,* and *French, supra* (emphasis added). A further key
distinction is that in *Lentz,* the replacement mortgage was for a larger
loan that encumbered two additional parcels of property, which some
jurisdictions recognize as precluding equitable subrogation. *Lentz, supra*
at 451; see also *id.* at 457 (BUTZEL, J., dissenting).

rule expressed in the Restatement. As more recently explained by our Supreme Court:

> "[E]quitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other. It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor, and that the subrogee may not be a 'mere volunteer.' " [*Auto-Owners Ins Co v Amoco Production Co*, 468 Mich 53, 59; 658 NW2d 460 (2003), quoting *Commercial Union Ins Co v Medical Protective Co*, 426 Mich 109, 117; 393 NW2d 479 (1986) (opinion by WILLIAMS, C.J. (citations omitted).]

In this case, Yousif borrowed a substantial amount of money from Ameriquest, and pledged the property as collateral. He signed a form requesting that Ameriquest use the loan proceeds to pay off the existing Franklin mortgage. Ameriquest performed as Yousif, its customer, instructed, and paid off the Franklin mortgage. By paying off the Franklin mortgage, Ameriquest was protecting its own security interest in the property, granted to it by Yousif. As recognized in comment e of the Restatement, § 7.6, it was in Ameriquest's best interests to ensure that Franklin, the Yousifs' primary creditor, was paid off so that, in the event of a default on the Ameriquest loan, Ameriquest would be able to recover its money by foreclosing on the property. Otherwise, Ameriquest's security interest would be of little value because, on foreclosure, substantially all the proceeds of the sale would go toward paying off the more senior Franklin mortgage. See Restatement, § 7.6, comment a, pp 509-510.

Comment e of the Restatement addresses these specific circumstances:

> *A mortgage debtor may ask another person to discharge the debt. In some circumstances, the payor who does so is warranted in receiving, by subrogation, the benefit and priority of the mortgage paid. The most common context for this sort of subrogation is the "refinancing" of a mortgage loan; that is, the payment of a loan with the proceeds of another loan.*

* * *

> *When a mortgage loan is paid by one who makes a new loan for that purpose, the payor will have the benefit of subrogation to the mortgage that was discharged only if the payor was promised repayment of the funds advanced and reasonably expected to receive a mortgage, with the priority of the discharged mortgage, on the real estate to secure that repayment. . . .* Thus, a payor who makes a mere gift, or who makes a loan that is, by its terms, unsecured or secured with a lien of inferior priority, cannot claim subrogation, since that would provide the payor with an unwarranted windfall. . . . On the other hand, if the debtor promises to provide security in the real estate to the payor, but fails to do so, the payor is entitled to subrogation.
>
> Perhaps the case occurring most frequently is that in which the payor is actually given a mortgage on the real estate, but in the absence of subrogation it would be subordinate to some intervening interest, such as a junior lien. Here subrogation is entirely appropriate, and by virtue of it the payor has the priority of the original mortgage that was discharged. This priority is often of critical importance, since it will place the payor's security in a position superior to intervening liens and other interests in the real estate. The holders of such intervening interests can hardly complain of this result, for it does not harm them; their position is not materially prejudiced, but is simply unchanged. [Restatement, § 7.6, comment e, p 519 (emphasis added).]

To the extent that the "volunteer" rule of *Washington Mut Bank* is inconsistent with the foregoing test

from the Restatement, we would reject the rule in favor of the Restatement. Likewise, to the extent that *Deutsche Bank, supra* at 614-615, reiterates and extends the volunteer rule of *Washington Mut Bank* to "sophisticated financial institutions that can choose the terms of their credit agreements," and deems such entities as "mere volunteers," we would similarly reject the holding of *Deutsche Bank*. See *Lamb Excavation, Inc v Chase Manhattan Mortgage Corp*, 208 Ariz 478, 482; 95 P3d 542 (2004) (status as a sophisticated lender does not preclude equitable subrogation).

C

Properly viewed, equitable subrogation is a doctrine that by its very definition must depend on the equities involved in the case being considered. "Equitable subrogation is a flexible, elastic doctrine of equity." *Hartford Accident & Indemnity Co v Used Car Factory, Inc*, 461 Mich 210, 215; 600 NW2d 630 (1999). Its application is to be determined on a case-by-case basis. *Id*. That is, equitable subrogation, by its very nature, is not susceptible to a bright-line rule such as that laid down in *Washington Mut Bank*.

It seems entirely logical therefore that applying the doctrine in *Walker* led to a different result than in *Lentz,* because the views of the particular equities at issue differed, although the Court in *Washington Mut Bank* found these cases to be irreconcilable. *Washington Mut Bank, supra* at 114, 116. In *Washington Mut Bank,* the Court emphasized that *Lentz* effectively overruled *Walker,* and thereby precluded the application of equitable subrogation to a refinanced mortgage under the volunteer rule:

> "This case [*Walker*] holds that a mere stranger to the title who voluntarily advances money to help a fraudulent

holder of real estate pay a mortgage placed by him thereon has equities more appealing to the conscience of the court than those of the real but defrauded owner of the real estate with notice of whose rights the money was advanced. This case stands alone. It violates all the principles underlying the cases involving legal or conventional subrogation in England and America. It is not a precedent to be followed, but an accident to be avoided." [*Washington Mut Bank, supra* at 118, quoting *Lentz, supra* at 455 (POTTER, J., concurring).]

However, the above-quoted excerpt raises a question whether Justice POTTER, and the holding in *Lentz*, stands for the proposition that a refinancing mortgagee is, as a rule, never entitled to equitable subrogation, as *Washington Mut Bank* concluded. Such a holding is not in concert with the statements that "[*Walker*] stands alone," and "It violates all the principles underlying the cases involving legal or conventional subrogation in England and America."

Other jurisdictions have long held that a refinancing mortgagee may be equitably subrogated to the priority position of the original lender. "The acceptance of a new mortgage and the discharge of a prior mortgage has traditionally not deprived a mortgagee of the right to have the lien of the prior mortgage continued as against a lien intervening between the old and new mortgages."[8] 43 ALR5th 519, p 519. Therefore, an equally

---

[8] Other jurisdictions that, like Michigan, recognize that equitable subrogation is unavailable to a "mere volunteer" do not necessarily view a refinancing mortgage lender as a volunteer. See, e.g., *Lamb Excavation, Inc, supra* at 483 (clear that lender was not acting as a volunteer in paying off the loan; nothing suggested the lender's motivation was anything other than commercial) and *Eastern Savings Bank, FSB v Pappas*, 829 A2d 953, 961 (DC, 2003) (lender made the payment in its own interest and did not act as a volunteer), both of which cited case law predating *Lentz*. "This theory that the purchaser is a volunteer is, we think, entitled to little weight. The purchaser is advancing his money

plausible conclusion is that the holding in *Walker* was viewed by Justice POTTER as an aberration *because the equities did not support the application of equitable subrogation on the facts of that case*, i.e., because *Walker* held "that a mere stranger to the title who voluntarily advances money to help a fraudulent holder of real estate pay a mortgage placed by him thereon has *equities more appealing to the conscience of the court* than those of the real but defrauded owner of the real estate with notice of whose rights the money was advanced." *Lentz, supra* at 455 (POTTER, J., concurring) (emphasis added). The application of equitable subrogation is rightfully defeated if based on a fraudulent claim:

> Because subrogation is a creature of equity, "its application may be defeated by intervening rights which would be prejudiced by the substitution." As an equitable construct, "[i]t rests upon the principle that substantial justice should be attained, regardless of form." [*Lamb Excavation, Inc, supra* at 481-482, quoting *Peterman-Donnelly Engineers & Contractors Corp v First Nat'l Bank of Arizona*, 2 Ariz App 321, 326; 408 P2d 841 (1965), and *Mosher v Conway*, 45 Ariz 463, 468; 46 P2d 110 (1935).]

An additional complication results from the *Washington Mut Bank* interpretation of *Lentz*. If *French*, quoted by *Walker, Lentz*, and *Washington Mut Bank*, remains good law, then there is a potential conflict between *French* and the rule of *Washington Mut Bank*. In *French*, the question was whether the plaintiff holder of the first priority mortgage could be compelled to assign her mortgage to the mortgagee who had refinanced the loan, who would otherwise be third in

---

intending to get something for it, to wit, a title unencumbered by the lien to be discharged. It is hardly in accord with reality to say that he pays officiously, as an intermeddler." *Eastern Savings Bank, FSB, supra* at 961 n 14, quoting *Burgoon v Lavezzo*, 68 App DC 20, 26; 92 F2d 726 (1937).

priority because of an intervening second mortgage. *French, supra* at 580. The Court held that the assignment could be compelled. *Id.* at 583-584. Thus, the rule of *French* is that a refinancing lender may compel an assignment of the prior mortgage to acquire its priority position. The rule of *Washington Mut Bank* is that a refinancing lender is a "mere volunteer" and may not, through equitable subrogation, be substituted to the priority position of the prior mortgage. These two rules cannot peacefully coexist in the law because they clearly work at cross purposes. We are convinced that the volunteer rule of *Washington Mut Bank* must yield:

> "If [the lender], instead of taking a release of the two mortgages, had taken an assignment of them, the question here discussed would never have been raised. As he paid off the mortgages at the request of the debtors, they would unquestionably have been assigned to him without recourse, had he requested it. He was entitled to an assignment. . . . If it be correct that [the lender's] position was not that of a volunteer or stranger, then it is immaterial that a release, instead of an assignment, was made. Where the rights of innocent third persons have not intervened, the release will not prevent the person making the payment from becoming the equitable assignee of the claim paid." [*Eastern Savings Bank, FSB v Pappas*, 829 A2d 953, 959 (DC, 2003), quoting *Burgoon v Lavezzo*, 68 App DC 20, 29; 92 F2d 726 (1937) (internal citation omitted).]

Certainly, the justices deciding *Lentz*, in relying on the framework of *French*, were cognizant of its holding and could not have ignored the inherent conflict that results from deeming refinancing lenders "mere volunteers," thereby automatically barred from the remedy of equitable subrogation. If the assignment of a mortgage priority may be compelled, then the bar to subro-

gation serves no meaningful purpose. It simply requires additional litigation and judicial resources.[9]

The parameters of equitable subrogation have developed to permit its application to avoid injustice, and to preclude its application in circumstances in which the equities do not warrant relief.

> Stated in its most simple terms, "legal" subrogation arises by operation of law, whereas "conventional" subrogation arises by virtue of a contract. . . .
>
> In defining the meaning of subrogation, the courts have also used the concept of "equitable subrogation," which is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted, or subrogated, to all the rights and remedies of the other. Equitable subrogation has been defined as a flexible and broad doctrine, and the mere fact that it has not been previously invoked in a particular situation is not a prima facie bar to its applicability. [29 Michigan Law and Practice, Subrogation, § 1, p 532 (citations omitted).]

To adhere to the narrow and rigid rule resulting from *Washington Mut Bank* is contrary to the very nature of the doctrine of equitable subrogation and unnecessary, even if its application led to the right result in the circumstances of that case.

In *Washington Mut Bank*, the refinancer neglected to discover two outstanding intervening mortgages of $200,000 and $249,000 in making its loan of $392,000, used primarily to discharge the first priority mortgage.

---

[9] It is possible that because *French* involved a forced sale of the property, assignment may be compelled only in that circumstance, particularly since *Lentz* was decided after *French* and is recognized by *Washington Mut Bank* as overruling earlier precedent to the contrary. However, the general right to compel assignment is recognized in other jurisdictions. See, e.g., *Eastern Savings Bank, FSB, supra.* In any event, this legal quandary is an additional reason for a more thorough consideration of the *Washington Mut Bank* rule and whether it should stand.

Accordingly, in that case the equities are not clearly in favor of recognizing a substitution in priority. However, the equities in this case fall squarely in favor of granting relief to Ameriquest as opposed to Alton, who is without any claim of material prejudice and whose windfall profit of more than $200,000 offends all sense of justice. In our view, the trial court correctly concluded that, on the facts of this case, Ameriquest was not a mere volunteer, and that it was equitably subrogated to the Franklin mortgage's priority position over the Alton mortgage to the extent of Ameriquest's payoff.

D

Alton further claims that Ameriquest was negligent in failing to update its title search before the closing of its mortgage, which might have revealed Alton's lien. Ameriquest counters that Alton's mortgage was recorded only three days before its closing and, therefore, it might not have been discovered.

Comment e of the Restatement, § 7.6, pp 519-520, states:

> Many judicial opinions dealing with a mortgagee who pays a preexisting mortgage focus on whether the payor had notice of the intervening interest at the time of the payment. Most of the cases disqualify the payor who has actual knowledge of the intervening interest, although they do not consider constructive notice from the public records to impair the payor's right of subrogation. Under this Restatement, however, subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant. The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid. Ordinarily lenders who provide

> refinancing desire and expect precisely that,[10] even if they
> are aware of an intervening lien. . . . A refinancing mort-
> gagee should be found to lack such an expectation only
> where there is affirmative proof that the mortgagee in-
> tended to subordinate its mortgage to the intervening
> interest.

In our view, it is not reasonable to expect that Ame-
riquest would update its title search immediately before
the closing, particularly given Yousif's affidavit that
there were no liens on the property other than the
Franklin mortgage. We concur with the trial court's
conclusion that the lapse of three days between the
recording of Alton's mortgage and the closing of Ame-
riquest's loan is not reflective of neglectful conduct that
precludes equitable relief.

However, as noted, not all jurisdictions follow the
Restatement view with respect to notice. There are
generally three approaches in determining whether a
subrogee's knowledge of an existing lien precludes
equitable subrogation, although some courts refuse to
adopt a bright-line rule and simply consider construc-
tive or actual knowledge as a factor in weighing the
equities. *Houston v Bank of America Fed Savings Bank*,
78 P3d 71, 73 (Nev, 2003), citing *East Boston Savings
Bank v Ogan*, 428 Mass 327; 701 NE2d 331 (1998). The
majority view is that actual knowledge of an existing
lien bars a claim of equitable subrogation, but construc-
tive knowledge does not.[11] *Houston, supra*. A second
approach precludes the application of subrogation if a
lien holder had either actual or constructive notice of an

---

[10] Indeed, one would expect that the lender would consent to its loan
only where these conditions are met.

[11] The rationale is that "if a mortgagee did not possess actual notice of
a junior lien holder, the mortgagee expected to step into the shoes of the
previous creditor it had paid off." *Houston, supra* at 73. This view is
criticized as discouraging prospective mortgagees from conducting title
searches, *id.*, and is increasingly disfavored.

existing lien.[12] *Id*. The third approach, and that adopted by the Restatement, § 7.6, "disregards actual or constructive notice if the junior lien holder is not prejudiced." *Houston, supra* at 74.

Because it is undisputed in this case that Ameriquest did not have actual notice of Alton's intervening loan, we need not decide whether to follow the majority rule or the Restatement in this regard. See *Eastern Savings Bank, FSB, supra* at 959 n 11 ("[b]ecause, albeit arguably on account of its own negligence or the negligence of Certified, Eastern did not have *actual* notice of the heirs' intervening liens, we need not decide whether to follow the majority rule [actual knowledge bars equitable subrogation] or the RESTATEMENT rule [it does not]"). We note only that the absence of actual notice of a mortgage recorded three days before the closing on the Ameriquest loan clearly distinguishes the equities herein from those in *Washington Mut Bank*, in which the refinancing mortgagee neglected to discover the intervening recorded mortgages. In this regard, the result in *Washington Mut Bank* is more properly reached on a consideration of the equities, and particularly the issue of notice, rather than on the basis of a rule that equitable subrogation is inapplicable.

IV

Alton also argues that his title to the Ivanhoe property obtained through the sheriff's sale is not subject to

---

[12] This approach runs contrary to the purposes of equitable subrogation, which is to avoid an unearned windfall at the expense of another. "Neither negligence nor constructive notice of an existing lien is relevant as to whether the junior lien holder will be unjustly enriched or prejudiced. The 'basis for subrogation in [the mortgage] context is the lender's justified expectation of receiving [a] security' interest in the property." *Houston, supra* at 74 (citation omitted).

Ameriquest's lien. As Ameriquest notes, Alton failed to properly preserve this issue by including it in his statement of questions presented. Independent issues not raised in the statement of questions presented are not properly presented for appellate review. *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000).

In any event, this issue is unrelated to the question of subrogation. The trial court did not hold that Ameriquest's mortgage interest prevailed over Alton's mortgage interest, or that Ameriquest's interest somehow nullified Alton's sheriff's deed. Rather, as noted by Ameriquest, because senior lienholders are not discharged during a foreclosure by a junior lienholder, Alton owns the property subject to Ameriquest's security interest (to the extent that Ameriquest is equitably subrogated to the priority position of the Franklin mortgage). See MCL 600.3236; see also *Bd of Trustees of Gen Retirement Sys of Detroit v Ren-Cen Indoor Tennis & Racquet Club*, 145 Mich App 318, 322; 377 NW2d 432 (1985). The remainder of Ameriquest's security interest was extinguished at the end of the redemption period following the sheriff's sale. *Deutsche Bank, supra* at 613; *Advanta Nat'l Bank v McClarty*, 257 Mich App 113, 125; 667 NW2d 880 (2003); see also MCL 600.3236.

V

Because the holding of *Washington Mut Bank* establishes an inflexible rule precluding the application of equitable subrogation in mortgage refinancing, we find it contrary to the principles of equity the doctrine is intended to promote. Although *Washington Mut Bank* recognizes the possibility of equitable subrogation if the replacement loan is provided by the holder of the old mortgage, or if the new lender first purchased the prior

mortgage and then accepted the new mortgage, *Washington Mut Bank* does not appear to permit an exception in this case despite the inequitable result. Existing Michigan law concerning equitable subrogation in the context of mortgage refinancing is confusing at best, and is contrary to logic, the Restatement of Property, and the view in many jurisdictions. These circumstances merit further consideration.

Should the volunteer rule of *Washington Mut Bank* be found to be a proper interpretation of *Lentz*, we urge the Michigan Supreme Court to review and reconsider this precedent in light of the prevailing modern view reflected in the Restatement. " '[T]he great majority of case law holds that one who pays the mortgage of another and takes a new mortgage as security will be subrogated to the rights of the first mortgagee as against any intervening lienholder.' " *Eastern Savings Bank, supra* at 957, quoting *GE Capital Mortgage Services, Inc v Levenson,* 338 Md 227, 657 A2d 1170, 1175 (1995). Where the equities are in favor of the payor mortgagee, we believe this rule should prevail. Given the common practice of mortgage refinancing and the sheer volume of transactions undertaken, equitable subrogation is a proper and necessary mechanism for resolving priority disputes to avoid injustice.

Reversed.